IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

Case No. 22-12675

PRIDE OF ST. LUCIE LODGE 1189, INC., et al.,

*Appellants*,

v.

KINSALE INSURANCE COMPANY,

*Appellee.*

## APPELLANT PRIDE OF ST. LUCIE LODGE 1189, INC.'S INITIAL BRIEF

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Fred A. Cunningham
Florida Bar No. 775487
Matthew T. Christ
Florida Bar No. 119106
DOMNICK CUNNINGHAM
& WHALEN
2401 PGA Boulevard, Suite 140
Palm Beach Gardens, Florida 33410
Tel.: 561-625-6260
fred@dcwlaw.com
mtc@dcwlaw.com

Stephen F. Rosenthal
Florida Bar No. 131458
Christina H. Martinez
Florida Bar No. 1029432
PODHURST ORSECK, P.A.
1 S.E. 3rd Avenue, Suite 2300
Miami, Florida 33130
Tel.: 305-358-2800
srosenthal@podhurst.com
cmartinez@podhurst.com

*Counsel for Appellant Pride of St. Lucie Lodge 1189, Inc.*

*Pride of St. Lucie Lodge 1189, Inc., et al. v. Kinsale Ins. Co. v.*
Case No. 22-12675

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

The Appellant submits this list, which includes all trial judges, attorneys, persons, associations of persons, firms, partnerships or corporations that have an interest in the outcome of this appeal:

1.    Bahadoran, Sina

2.    Blecke, James Curtis

3.    Christ, Matthew Thomas

4.    Clyde & Co. US LLP

5.    Cunningham, Fred Alan

6.    Domnick Cunningham & Whalen

7.    The Haggard Law Firm

8.    Haggard, Michael

9.    Kinsale Insurance Company, Plaintiff/Counter-Defendant

10.    Khutorsky, Gary

11.    Lever, Daniel R.

12.    Litchfield Cavo LLP

13.    Marlowe, Christopher

14.    Martinez, Christina H.

15.    Maynard, The Honorable Shaniek M.

C 1 of 2

*Pride of St. Lucie Lodge 1189, Inc., et al. v. Kinsale Ins. Co. v.*
Case No. 22-12675

16.     Moore, The Honorable K. Michael

17.     Mount Vernon Fire Insurance Company

18.     Podhurst Orseck, P.A.

19.     Pride of St. Lucie Lodge 1189, Inc., Defendant/Counter-Claimant

20.     Reed, Teaira Nicole, as Personal Representative of the Estate of Tanya Renee Oliver, Defendant/Counter-Claimant

21.     Rosenthal, Stephen F.

22.     Warren, Aaron Leles

### Corporate Disclosure Statement

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1 through 26.1-3, Appellant states:

1.     There is no subsidiary, parent corporation, or publicly held corporation that owns 10% or more of the stock of Pride of St. Lucie Lodge 1189, Inc.

2.     Upon information and belief, Kinsale Capital Group, Inc. ("KCGI") is the parent company of Plaintiff/Appellee Kinsale Insurance Company ("Kinsale") and owns 100% of Kinsale's stock.  KCGI is a publicly held corporation.


*/s/     Stephen F. Rosenthal*
Stephen F. Rosenthal
Fla. Bar No. 0131458

**Podhurst Orseck, P.A.**
One S.E. 3rd Avenue, Suite 2300, Miami, FL 33131 • Miami 305.358.2800 Fax 305.358.2382 • Ft Lauderdale 954.463.4346                 www.podhurst.com

## STATEMENT REGARDING ORAL ARGUMENT

Appellant respectfully submits that although the errors in the district court's opinion granting summary judgment are patent, oral argument may nonetheless facilitate the Court's resolution of some of the fact-bound issues raised on appeal and wishes to have the opportunity to respond to any questions the panel may have.

i

# TABLE OF CONTENTS

**PAGE**

STATEMENT OF JURISDICTION.................................................................1

ISSUE ON APPEAL......................................................................................2

STATEMENT OF THE CASE AND FACTS ...............................................2

    A.    The Incident.........................................................................3

    B.    Kinsale's Deficient Investigation ........................................4

    C.    The Parties' Assessment of Kinsale's Liability ..................12

    D.    The Wrongful Death Litigation..........................................14

    E.    The Bad Faith Case and Summary Judgment .....................15

SUMMARY OF ARGUMENT ...................................................................18

STANDARD OF REVIEW .........................................................................19

ARGUMENT ..............................................................................................20

I.   THE DISTRICT COURT ERRED IN GRANTING SUMMARY
JUDGMENT BASED ON A ONE-SIDED VIEW OF THE
EVIDENCE ................................................................................20

    A.    The District Court's Errant Analysis Begins from a Failure
to Recognize That Under Florida Law a Court Must
Consider the Totality of the Circumstances to Determine
Whether an Affirmative Duty to Settle a Potential Claim
Arises ................................................................................22

    B.    The District Court Mistakenly Discounted the Evidence of
Kinsale's Inadequate Investigation of Its Insured's
Liability ..............................................................................27

**Podhurst Orseck, P.A.**

One S.E. 3rd Avenue, Suite 2300, Miami, FL 33131 • Miami 305.358.2800 Fax 305.358.2382 • Ft Lauderdale 954.463.4346                    www.podhurst.com

C.   The District Court Mistakenly Ignored Evidence That the Lodge Faced Clear Premises Liability for the Shooting and That Kinsale Should Have Appreciated That Risk ............................... 33

D.   The District Court Insisted Upon Too Rigid a Standard for What Constitutes "Clear" Liability ....................................................... 39

CONCLUSION .................................................................................................. 45

CERTIFICATE OF COMPLIANCE .................................................................. 46

CERTIFICATE OF SERVICE ........................................................................... 46

**Podhurst Orseck, P.A.**
One S.E. 3rd Avenue, Suite 2300, Miami, FL 33131 • Miami 305.358.2800 Fax 305.358.2382 • Ft Lauderdale 954.463.4346                                          www.podhurst.com

## <u>TABLE OF AUTHORITIES</u>

**PAGE(S)**

*Aldana v. Progressive Am. Ins. Co.*,

　　828 F. App'x 663 (11th Cir. 2020) .................................................37

*Allstate Ins. Co. v. Vanater*,

　　297 So. 2d 293 (Fla. 1974) .............................................................40

*Alt v. Am. Family Mut. Ins. Co.*,

　　237 N.W.2d 706 (Wis. 1976) .........................................................28

*Amy v. Carnival Corp.*,

　　961 F.3d 1303 (11th Cir. 2016) ......................................................37

*Anderson v. Liberty Lobby, Inc.*,

　　477 U.S. 242, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986) ................20

*Auto. Mut. Indem. Co. v. Shaw*,

　　184 So. 852 (Fla. 1938) ..................................................................23

*Borda v. E. Coast Entm't, Inc.*,

　　950 So. 2d 488 (Fla. Dist. Ct. App. 2007) ...............................34, 43

*Boston Old Colony Ins. Co. v. Gutierrez*,

　　386 So.2d 783 (Fla. 1980) ........................................22, 24, 26, 38

*Campbell v. Gov't Empl. Ins. Co.*,

　　306 So. 2d 525 (Fla. 1974) .............................................................38

iv

*Chapman v. AI Transp.*,

    229 F.3d 1012 (11th Cir. 2000) ....................................................19

*Evans v. McCabe 415, Inc.*,

    168 So. 3d 238 (Fla. Dist. Ct. App. 2015).....................................30

*Goheagan v. Am. Vehicle Ins. Co.*,

    107 So. 3d 433 (Fla. Dist. Ct. App. 2012).....................................26

*Hall v. Billy Jack's, Inc.*,

    458. 2d 760 (Fla. 1984) ...............................................................34

\* *Harvey v. GEICO Gen. Ins. Co.*,

    259 So. 3d 1 (Fla. 2018) ................................... 24, 25, 26, 28, 35, 38

*McNamara v. Gov't Emps. Ins. Co.*,

    30 F.4th 1055 (11th Cir. 2022).....................................................22

*Moore v. GEICO Gen. Ins. Co.*,

    633 F. App'x 924 (11th Cir. 2016).........................................35, 37

*Morton v. Kirkwood,*

    707 F.3d 1276 (11th Cir. 2013) ...................................................32

\* *Powell v. Prudential Prop. & Cas. Co.*,

    584 So. 2d 12 (Fla. Dist. Ct. App. 1991)...... 15, 16, 17, 25, 39, 40, 41, 42, 43

**Podhurst Orseck, P.A.**
One S.E. 3rd Avenue, Suite 2300, Miami, FL 33131 • Miami 305.358.2800 Fax 305.358.2382 • Ft Lauderdale 954.463.4346    www.podhurst.com

*Riley v. City of Montgomery*,

    104 F.3d 1247 (11th Cir. 1997) ....................................................................32

*Rova Farms Resort, Inc. v. Investors Ins. Co.*,

    323 A.2d 495 (N.J. 1974) ....................................................................40, 41

*Sapp v. United States*,

    No. 21-12282, 2022 WL 110227 (11th Cir. Jan. 12, 2022) ..........................30

\*    *Strickland v. Norfolk S. Ry. Co.*,

    692 F.3d 1151 (11th Cir. 2012) .........................................................20, 21, 37

*Tippens v. Celotex Corp.*,

    805 F.2d 949 (11th Cir. 1986) ....................................................................20

*Valderrama v. Rousseau*,

    780 F.3d 1108 (11th Cir. 2015) .............................................................20, 32

*Welford v. Liberty Mut. Ins. Corp.*,

    190 F. Supp. 3d 1085 (N.D. Fla. 2016),

    *aff'd,* 713 F. App'x 969 (11th Cir. 2017) ...............................................39, 40

## STATUTES

28 U.S.C. § 1291 .........................................................................................1

28 U.S.C. § 1332 .........................................................................................1

28 U.S.C. § 1332(c)(2) ..................................................................................1

§ 768.125, Fla. Stat. ....................................................................................30

**Podhurst Orseck, P.A.**

One S.E. 3rd Avenue, Suite 2300, Miami, FL 33131 • Miami 305.358.2800 Fax 305.358.2382 • Ft Lauderdale 954.463.4346    www.podhurst.com

## STATEMENT OF JURISDICTION

This Court has jurisdiction because the order granting summary judgment, Docket Entry ("DE") 142, is a final order.  *See* 28 U.S.C. § 1291.  Subject-matter jurisdiction is based on diversity.  *See* 28 U.S.C. § 1332.  Plaintiff-Appellee Kinsale Insurance Company is an Arkansas corporation with its principal place of business in Virginia.  DE 1, ¶ 5.

Defendant-Appellant, Pride of St. Lucie Lodge 1189, Inc. is a Florida corporation with its principal place of business in Fort Pierce, Florida.  *Id.*, ¶ 6.

Because Tanya Renee Oliver, the decedent, was domiciled in Fort Pierce, Florida at the time of her death, Defendant-Appellant, Reed, as the personal representative of the Estate, is a citizen of the State of Florida.  28 U.S.C. § 1332(c)(2).  The amount in controversy exceeds $75,000.  *See* DE 1, ¶ 2; 28 U.S.C. § 1332(c)(1).

1

## ISSUE ON APPEAL

Whether, in a bad faith case against an insurance company in

Florida, where injuries were so serious that a judgment in excess of

the policy limits is likely, a court must look to the totality of the

circumstances to determine whether the liability case against an

insured is "clear" such that an affirmative duty arises on the part of an

insurer to initiate settlement discussions?

## STATEMENT OF THE CASE AND FACTS

This appeal arises from a grant of summary judgment that terminated Pride

of St. Lucie Lodge 1189, Inc.'s counterclaim for bad faith against Kinsale

Insurance Company, the Lodge's insurer.  DE 142 (Order).  The jury in the

underlying state court action between Teaira Nicole Reed as personal

representative of the Estate of Tanya Oliver and the Lodge rendered a verdict

against the Lodge that resulted in a multi-million-dollar judgment against it for

negligent security in connection with a shooting that left the decedent, Tanya

Oliver, in critical condition until she succumbed to her injuries and died over a

year later.  Shortly after the judgment in state court, Kinsale filed a declaratory

judgment action in federal court against the Estate and the Lodge.  The Lodge, like

the Estate, filed a counterclaim alleging that Kinsale had breached its good faith

**Podhurst Orseck, P.A.**
One S.E. 3rd Avenue, Suite 2300, Miami, FL 33131 • Miami 305.358.2800 Fax 305.358.2382 • Ft Lauderdale 954.463.4346    www.podhurst.com

duty toward the Lodge under its insurance policy and Florida law.  DE 47, ¶¶ 20-26.

## A.  The Incident

During the early hours of March 2, 2015, Tanya Oliver was shot in the head in the Lodge's parking lot shortly after she and her friends were escorted out of the building by volunteer security.  DE 107 (Estate's statement of material facts), ¶¶ 71-72 (citing DE 98 (Claims Notes) at 31-32).[1]  The Lodge, a private, members-only fraternal club in Fort Pierce, is used as an event space on the weekends, and Oliver had been attending one of its events with her friends when a fight broke out between someone in her party and an individual from another group.  *Id.*; DE 99 (Kinsale's statement of material facts), ¶ 3 (citing DE 92 at 31-32).  The Lodge's security volunteers separated the two groups and escorted them out of the building, leading one group through one exit while Oliver and her friends were escorted out of the building through another exit.  DE 98 at 30-31.

The security personnel went back inside.  In the absence of any security presence, the other group made its way to the Lodge's parking lot where Oliver and her friends were already in their own car.  *Id.*  The woman previously involved in the altercation with Oliver's friend in the club fired multiple shots into the front

---

[1] Citations to page numbers refer to the pagination generated in ECF headers, unless otherwise noted and for deposition transcripts, where the transcript pagination is used.

**Podhurst Orseck, P.A.**
One S.E. 3rd Avenue, Suite 2300, Miami, FL 33131 • Miami 305.358.2800 Fax 305.358.2382 • Ft Lauderdale 954.463.4346    www.podhurst.com

passenger seat of the car where Oliver was sitting, hitting her in the forehead. *Id.* at 30-32; DE 99, ¶¶ 22-23 (citing DE 90 at 45 (police report)).

The Lodge had not installed surveillance cameras in its parking lot, so there is no footage of the shooting. DE 98 (Thrift Decl.) at 31. Nor could the volunteer security provide eyewitness accounts of the shooting, because they returned inside immediately after showing Oliver's and the other group out. *See id.* (noting Danowit report that there were no eyewitnesses); DE 95 at 57.

Oliver was taken to an intensive care unit where she would remain in critical condition until her death in July 2016. DE 99, ¶ 55 (citing DE 88 at 94:5-15).

### B. Kinsale's Deficient Investigation

At the time of the shooting, the Lodge was insured under a surplus lines general liability insurance policy issued by Kinsale and a liquor-liability policy issued by Mount Vernon Fire Insurance Company. *See* DE 99, ¶ 4 (citing DE 1-3 (Kinsale policy)). Kinsale's policy included a special endorsement that limited the maximum amount of damages to $50,000 for claims arising out of assault and battery. *Id.* (citing DE 1-3 at 36-37). It also included an endorsement which provided that any expenses Kinsale incurred in investigating any claim or defending any lawsuit reduced the total limit of insurance. *See id.*, ¶ 5 (citing DE 1-3 at 33-35).

4

The Mount Vernon policy covered liability for bodily injury arising out of the service of alcohol and contained an endorsement which limited the amount of insurance to $300,000 for claims arising out of assault or battery.  *Id.*, ¶¶ 6-7 (citing DE 93 at 123-36 & DE 94 at 1-23 (Mount Vernon policy); DE 94 at 20 (assault or battery sublimit endorsement)).  It also contained an "Absolute Firearms Exclusion" which provided that the policy did not apply to any injury, claim, or suit "arising or resulting from[,] directly[] or indirectly, the use of firearms of any kind."  DE 114 (Lodge's statement of material facts) (quoting DE 94 at 21).

Teaira Nicole Reed, Oliver's daughter and subsequently the personal representative of the Oliver Estate, retained Joseph Landy as counsel for the Estate, and on November 5, 2015 he sent a letter to the Lodge notifying it that it may be liable in the Oliver shooting.  DE 95 at 51-52.  Kinsale received the notice of a potential claim from the Lodge on November 23, 2015.  DE 98 at 1, ¶ 4; *id.* at 6-7.  The notice advised that a "drive[-]by shooting" had occurred in the Lodge's parking lot.  *Id.* at 6.  The Lodge email prompting the notice also indicated that the "victim [of the shooting] was actually in [the Lodge's] parking lot," and that the incident was related to the club.  *Id.* at 13.

The same day it received the notice, Kinsale assigned senior claims examiner Catherine Thrift to investigate the potential claim.  *Id.* at 2, ¶ 6; *id.* at 12.  Thrift quickly located two news articles about the shooting such that, as of that

**Podhurst Orseck, P.A.**
One S.E. 3rd Avenue, Suite 2300, Miami, FL 33131 • Miami 305.358.2800 Fax 305.358.2382 • Ft Lauderdale 954.463.4346                www.podhurst.com

day, she was aware that the suspect or suspects had used handguns and "fir[ed]
them multiple times," that Oliver had been "shot in the head," and that she was in
"critical condition." *See* DE 107, ¶ 71 (citing DE 98 at 31-32). About a week
later, Thrift spoke with a Lodge principal to gather information about the claim.
*Id.*, ¶ 72. Although "he was not there at [the] time of loss," he explained, workers
informed him that two individuals "were asked to leave the building," but left and
"went into [the] back parking lot where [the] shooting occurred." *Id.* (citing DE 98
at 31). He informed Thrift that the Lodge does not hire security, instead relying on
"volunteers working their way into [club] membership" to provide security at their
events. *Id.* (citing DE 98 at 31).

Shortly thereafter, Thrift learned from the Lodge's insurance agent that the
incident had also been reported to Mount Vernon, the liquor-liability insurer, and
that Mount Vernon had hired David Danowit of Mitchell Claims Services to
"investigat[e] for the liquor liab[ility] policy." DE 98 at 30-31. Mount Vernon
had provided a written assignment to Mitchell Claims in order for them to
"complete [a] full liquor liability investigation" in accordance with attached
"Liquor Liability Investigation Guidelines." DE 107, ¶ 73 (citing DE 93 at 121-
22). The assignment explicitly notified Mitchell Claims that Mount Vernon "only
ha[d] the liquor liability policy," that the policy "ha[d] a firearms exclusion," and
that it "d[id] not have [general liability] coverage." *Id.* (citing DE 93 at 121-22)

**Podhurst Orseck, P.A.**
One S.E. 3rd Avenue, Suite 2300, Miami, FL 33131 • Miami 305.358.2800 Fax 305.358.2382 • Ft Lauderdale 954.463.4346     www.podhurst.com

(emphasis removed).  Pursuant to this liquor-liability assignment from Mount Vernon, Danowit prepared three investigation reports dated December 30, 2015, March 2, 2016, and April 26, 2016.  *See id.*, ¶¶ 74-76 (citing DE 95 at 53-60; *id.* at 61-64; *id.* at 65-66).[2]

Thrift spoke with Danowit on December 3, 2015.  DE 98 at 30-31.  He informed her that he had "met with the insured folks" and provided a narrative that corresponded in its basic facts with what Thrift already knew from her own conversation with the Lodge and from the news reports:  two women, each with her own group, had gotten into a fight at the Lodge that was eventually broken up by security.  *Id.* at 31-32.  Security escorted the respective groups out of the club, one "through the front door" and one "out the back."  *Id.*  About ten minutes later, the shooter drove by Oliver's friend's car and shot "about [five] shots" inside.  *Id.* at 31.  Danowit said that there was not any surveillance tape or witnesses who

---

[2] The December 30, 2015 report contains a heading entitled "Liquor Liability Investigation."  *See* DE 95 at 59.  In the March 2, 2016 report, Danowit noted under a "Liquor Liability Investigation" heading that "[n]obody has raised the issue of alcohol as a contributing factor to this incident."  *Id.* at 63.  Under a "General Liability Carrier" heading, that report references the Lodge's general liability policy through Kinsale and noted that Thrift's general liability "investigation parallels our investigation."  *Id.* at 63-64.  Under the same "General Liability Carrier" heading, the April 26, 2016 report indicated that Thrift "advised us they have completed their investigation and they have closed their file, as they see no liability on their insured."  *Id.* at 66.  Thrift did not obtain a copy of the reports, DE 87 (Thrift Dep.) at 188:7-8, and she remained unaware of at least portions of their content, *id.* at 166:14-167:5 (indicating Danowit had not shared with Thrift the details of his interviews).

7

could provide additional detail to the story, and confirmed that only volunteer security was present. *Id.* He also reported that "[t]here was apparently another fight [at the Lodge] in Jan 2015," just two months before the Oliver shooting. *Id.*

Kinsale's internal recordkeeping system notes indicate that Thrift did not take action on the claim for the next three months. *Id.* at 30-31; DE 87 at 72:3-7 (confirming same at deposition).[3] On March 1, 2016, she and Danowit had another conversation, lasting all of six minutes, in which he reported "no new updates" although he was still attempting to reach additional witnesses. DE 98 at 30; DE 107, ¶ 77 (citing Danowit's call log). Thus, the March 1 conversation revealed no new information to Thrift and, as of December 3, she had all the information she would ever have relating to the incident. *See* DE 87 at 73:5-22 (stating "there wasn't much information to be had during this time frame").

Specifically, Thrift knew a shooting had taken place between invitees of the Lodge on its property, and that there had been prior incidents there in the past. DE 98 at 31. She knew that only volunteer security was present at the event and had no reason to think they remained outside in the parking lot after escorting the two

---

[3] Danowit called Kinsale on December 29, 2015 to see if they had "received anything further" but was told the file indicated Kinsale had nothing additional to share. DE 98 at 30. The entry documenting that call reflects that a Kinsale adjuster other than Thrift had posted it to the system. *See id.* (reflecting "jhowe" and not "cthrift" was the adjuster who posted the entry).

Podhurst Orseck, P.A.
One S.E. 3rd Avenue, Suite 2300, Miami, FL 33131 • Miami 305.358.2800 Fax 305.358.2382 • Ft Lauderdale 954.463.4346          www.podhurst.com

groups out of the building. *Id.* at 31-32. She also knew, from her first day tasked with the claim, that someone was shot in the head, with a firearm, on the Lodge premises, *id.*, and knew "this was probably a – a bad damages case" with a clear potential for judgment in excess of the Lodge's $50,000 policy limit, DE 87 at 65:7-9. Mount Vernon's claims adjuster, Peter Alfeche, had additionally informed her that Mount Vernon's policy contained a firearms exclusion and that Mount Vernon did not intend to provide coverage for the Lodge in connection with the shooting. DE 93 (Alfeche Dep.) at 65:16-17 ("Every conversation I had with her, I mentioned the firearms exclusion."); *id.* at 65:18-25 (stating he had informed her before a lawsuit was filed that Mount Vernon did not believe it would provide coverage to the Lodge); *id.* at 66:6-23 (testifying that he was "100 percent sure" Thrift had expressed displeasure, both "before and after" the lawsuit was filed in August 2016, that Mount Vernon "would just deny coverage based on the severity of the injuries").[4]

---

[4] Conversations between Thrift and Alfeche suggest Thrift may have mistakenly believed Kinsale's policy was excess to Mount Vernon's, despite Alfeche's efforts to inform her about the difference between the two policies. *See* DE 93 at 20:7-18 (Alfeche describing a conversation with Thrift in which he explained that Mount Vernon issued a liquor-liability policy, not a general liability policy, and that the two "weren't dependent upon each other"); *id.* at 62:11-63:2 (relaying conversation in which "when [they] first talked," Thrift told him that "her policy was excess to [Mount Vernon's] policy," that he tried to explain the difference between the two policies, and that she disagreed with him, despite not having read the Mount Vernon policy).

9

Despite this understanding of the basic facts surrounding Oliver's claim against the Lodge, her knowledge of Kinsale's $50,000 policy limit, and Alfeche's indication that Mount Vernon's policy would not cover the incident, Thrift did not attempt to tender the policy limit at any time between her assignment to the claim and the filing of the complaint eight months later.

She also does not appear to have conducted further investigation after discovering that Danowit was investigating the liquor-liability policy. Her notes on Kinsale's internal recordkeeping system indicate she did not speak or attempt to speak with anyone at the Lodge or any other fact witness as part of her own independent investigation. DE 98 at 30-31; *see also* DE 87 at 184:3-186:13 (stating she was "not sure what more [she] could have done" between December 2015 and August 2016, besides her call to the insured and the agent, to determine whether the Lodge had exposure for negligent security). She did not attempt to contact Oliver or her family to learn about Oliver's condition, and her interaction with Oliver's attorney, Landy, was limited to sending a response to his policy-disclosure request. DE 87 at 73:23-74:13. Although she was "trying to determine which one of [the two] policies, if not both of those policies, may apply to this loss," she never asked Danowit or anyone else for a copy of the Mount Vernon policy. *Id.* at 67:2-14. When Thrift was asked what she was doing to investigate the claim herself, "besides relying on the investigation of Mr. Danowit," she

**Podhurst Orseck, P.A.**
One S.E. 3rd Avenue, Suite 2300, Miami, FL 33131 • Miami 305.358.2800 Fax 305.358.2382 • Ft Lauderdale 954.463.4346                    www.podhurst.com

pointed to the fact that she had asked for a copy of the police report from the insured, asked her insured (who had "very little" information) about the loss, and asked the insurance agent for the same information; otherwise, she admitted, she "was relying on Dave Danowit." DE 98 at 63:18-64:2; *see also id.* at 74:14-75:16 (stating she was "attempting to get that information [regarding the claim], you know, through him").

Five months after Thrift's March 1, 2016 conversation with Danowit, and over eight months after Kinsale received Landy's representation letter, on August 5, 2016, Oliver's Estate filed a single-count complaint for negligent security against the Lodge in St. Lucie County Circuit Court. DE 91 at 196-202. Kinsale's internal recordkeeping system notes reflect that no one at Kinsale had performed any activity on the claim in the five months between the March 1, 2016 conversation and the date Thrift entered the information about the state court complaint into the system, on August 12, 2016. DE 98 at 30.

Mount Vernon disclaimed coverage on August 18, 2018, citing the liquor-liability coverage form and the firearms exclusion, and noting that the Estate's complaint did not contain allegations related to the service of alcohol, but did contain allegations of injuries resulting from the use of a firearm. DE 99, ¶ 66 (citing DE 89 at 83:20-84:16); *see also* DE 89 at 176-77 (Mount Vernon letter disclaiming coverage). Despite having been informed multiple times before the

11

complaint's filing that Mount Vernon did not intend to provide coverage under its policy (DE 93 at 65:16-66:23), Thrift indicated that she was "shocked" by its disclaimer and urged it to reconsider and accept coverage.  DE 94 at 52.

Kinsale received a copy of the complaint on August 12, 2016 and sought to tender its $50,000 assault-and-battery policy limit to the Estate six days later. DE 87 at 119:21-121:15.  The Estate rejected that late offer.  *See id.* at 119:21-121:15.

### C.  The Parties' Assessment of Kinsale's Liability

From the outset, counsel for Oliver and subsequently her Estate were assessing Kinsale's liability for their own litigation purposes.  To Landy, the fact that the volunteer security had allowed both groups at the Lodge to exit simultaneously instead of ensuring that one party dispersed or that the altercation did not continue outside evidenced "clear" liability.  DE 107, ¶ 94 (citing DE 90 (Landy Dep.) at 30:14-21, 64:7-19; *see also* DE 90 at 31-32).

The Haggard Firm, where Michael Haggard and Christopher Marlowe took over the representation in December 2015 after Landy's referral, similarly considered the case against the Lodge to be one of "clear" liability.  *See* DE 107, ¶¶ 95-96 (citing DE 88 (Marlowe Dep.) and DE 91 (Haggard Dep.)).  When his firm was first retained, Marlowe understood that the loss involved a shooting in the rear parking lot of the insured's property arising out of an argument that began in

**Podhurst Orseck, P.A.**
One S.E. 3rd Avenue, Suite 2300, Miami, FL 33131 • Miami 305.358.2800 Fax 305.358.2382 • Ft Lauderdale 954.463.4346    www.podhurst.com

the club, and he considered that these basic facts made liability "clear." *Id.*, ¶ 95 (citing DE 88 at 32:18-34:10, 119:10-16, 120:3-5).

Haggard confirmed that once he learned the basic facts of the case from the police report, his early discussions with Marlowe reflected their joint impression that "we got great liability, clear liability in this case." DE 107, ¶ 96 (quoting DE 91 at 45:6-9). That the Lodge "put these people outside, and they started [fighting] again, and there was no security out there, and [the Lodge] didn't stop it" conveyed to Haggard at the outset of his representation that "there was clear liability" without the need for additional factual details. *Id.*, ¶ 96 (quoting DE 91 at 63:12-17). His understanding of the key facts remained unchanged "through the end of trial" where "the testimony really comported with everything that we learned in the beginning." *Id.*, ¶ 96 (quoting DE 91 at 63:17-20).

The Estate's lawyers were not the only ones who viewed the Lodge's liability as clear. Mount Vernon's claims adjuster, Peter Alfeche, testified that had he been in Kinsale's shoes, based on his and Danowit's investigation—the same investigation that Thrift had relied upon to assess Kinsale's liability—he would have tendered Kinsale's $50,000 policy limit before the Estate filed suit. DE 93 at 235:20-236:2. Alfeche considered it clear liability for security to lead the two fighting groups out through separate exits but then perform "really no … procedures after that" to ensure the patrons' safety. *Id.* at 155:14-18. Alfeche's

understanding of Oliver's "very serious" injuries, Kinsale's low policy sublimit, and the generally pro-plaintiff verdicts in Florida negligent security cases all supported tendering Kinsale's $50,000 policy limit, in his view. *Id.* at 236:5-15.

After suit was filed, Kinsale retained the law firm of Hamilton, Miller & Birthisel, LLP to defend the Lodge in the state court action, and their opinion of the Lodge's liability was consistent with the Estate's attorneys' and Alfeche's perception that liability was clear. In his initial case evaluation report to Kinsale, dated January 20, 2017, defense counsel, Jerry Hamilton, estimated that the likelihood of a favorable outcome for Kinsale was only 15% to 20%. DE 107-4 at 2. Hamilton advised that it was "likely that the [Estate] can establish foreseeability and causation" to prove that the "Lodge breached their duty of care." *Id.* at 4. And, while he suggested plausible arguments that the Lodge could pursue in its defense, he ultimately concluded that "liability is *difficult to overcome*" in light of applicable Florida law and of the fact that the shooting had occurred on the Lodge's premises, "which were, admittedly, lacking in proper security measures." *Id.* at 5 (emphasis added).

### D.  The Wrongful Death Litigation

The wrongful death case proceeded to trial in state court in 2019, and the jury returned a verdict resulting in a final judgment for the Estate of $3,348,623.89—more than 65 times the Kinsale policy limit. *See* DE 91 at 253.

**Podhurst Orseck, P.A.**
One S.E. 3rd Avenue, Suite 2300, Miami, FL 33131 • Miami 305.358.2800 Fax 305.358.2382 • Ft Lauderdale 954.463.4346                    www.podhurst.com

The verdict form reflected that the jury had answered "Yes" to the question asking "Was there negligence on the part of [the Lodge] that was the legal cause of the death of [Tanya Renee Oliver]?" and that they allocated 70% of the responsibility for her death to the Lodge. *Id.* at 255-56.

### E.  The Bad Faith Case and Summary Judgment

Following the state court judgment, Kinsale filed this declaratory judgment action in federal court, seeking a declaration that its liability policy's $50,000 assault-and-battery endorsement applies to the state court judgment. *See* DE 1. The Estate and the Lodge filed counterclaims alleging that Kinsale breached its duty of good faith in failing to settle the Estate's claim against the Lodge within its policy limits when it had the opportunity to do so. *See* DE 45, 47.  At the close of discovery, Kinsale filed a motion for summary judgment contending that, because the Lodge's liability was "never clear," the Lodge and the Estate could not argue that Kinsale had breached its affirmative duty to contact the claimant and voluntarily offer to pay the policy limits under *Powell v. Prudential Property & Casualty Company*, 584 So. 2d 12 (Fla. Dist. Ct. App. 1991), since the case imposes the duty only in cases of "clear" liability.  DE 100 at 1-2.

Kinsale sought summary judgment on the single issue that it had no affirmative duty to make a settlement offer in the absence of clear liability of its insured, arguing that it was not clear. *See generally id.*  It took the extreme

position that "clear" liability under the *Powell* doctrine means 100% liability. *Id*. at 5; *see* DE 124 at 4-6. The Lodge and the Estate opposed Kinsale's motion (DE 108; DE 115), and submitted their own statements of material facts in support, *see* DE 107; DE 114. The Lodge adopted the Estate's arguments in opposition to Kinsale's motion (DE 115 at 4), and separately disputed that Florida bad faith law under *Powell* requires an insurer to initiate discussion only in cases of "unambiguously clear" liability or cases where liability falls entirely on the insured. *Id.* at 2, 8. Noting that "[w]hether liability is clear … turns on the circumstances of each case" and that the "totality of the circumstances" is relevant to that inquiry (*id*. at 5, 13), the Lodge highlighted "Kinsale's repeated failures to conduct its own claim investigation" and other shortcomings with respect to Kinsale's claims handling to argue that "whether the Lodge was clearly liable under Florida bad faith law presents a question of fact for summary judgment." *Id.* at 2.

The Estate's statement of material facts, which the Lodge also adopted and incorporated into its own (DE 114 at 1), attached a publication regarding "Security for Bars, Taverns, Lounges, and Nightclubs" (DE 107-2) which the Estate's insurance industry expert, Lewis Jack, relied upon in forming his opinion that the premises liability case against the Lodge was clear (DE 106 at 118:17-25). The publication stressed the importance of having security monitor club parking lots or

16

outside areas close to the club "until all patrons and employees have left," and of how the "visible presence of security personnel" might deter incidents outside of the club. DE 107-2 at 6.

The district court concluded the Kinsale was entitled to summary judgment. It reasoned that "*Powell* imposes an affirmative duty to initiate settlement discussions only 'where liability is clear'" and that "[t]he undisputed facts show that liability for the Lodge was never clear." DE 142 at 8-9. Despite its summary of supposedly "undisputed facts," the court cited none of the evidence the Lodge and the Estate submitted on the question of the Lodge's liability. *See id.* at 2-5. Instead of considering their proffered evidence of Kinsale's inadequate investigation into the Estate's negligent security claim against the Lodge, the court appeared to read the applicable case law as requiring a finding of clear liability on the part of the insured "*before* moving on to further analysis" under the totality-of-the-circumstances standard that governs in bad faith cases. *Id*. at 9 (emphasis added). Without citing to the record, the court declared that "none of the parties who looked into the Lodge's liability ever suggested that the Lodge might bear more than questionable liability." *Id*. at 9-10. Its determination that the "liability for the Lodge was never clear" was based in part on the observation that neither Kinsale nor Mitchell Claims ever "consider[ed] the Lodge liable" at any point their

Podhurst Orseck, P.A.
One S.E. 3rd Avenue, Suite 2300, Miami, FL 33131 • Miami 305.358.2800 Fax 305.358.2382 • Ft Lauderdale 954.463.4346    www.podhurst.com

investigation and that the Estate waited over a year after the shooting to file its suit against the Lodge.  *Id.*

Upon entry of final judgment for Kinsale, the Lodge timely appealed.

## SUMMARY OF ARGUMENT

The district court's grant of summary judgment to Kinsale should be reversed for failure to comply with cardinal rules governing adjudication at that stage of litigation: consideration of *all* of the evidence presented, from *both* sides, and viewing that evidence and the reasonable inferences flowing from it in the light most favorable to the *non*-movant.  The order below reached the erroneous conclusion that no genuine issues of material fact existed bearing on whether Kinsale owed its insured, the Lodge, an affirmative duty to initiate settlement discussions with the Estate.  It did so by *wholly ignoring* evidence proffered by the Lodge (and the Estate) that the Lodge's liability for negligent security of its premises was clear and by *improperly discounting* reasonable inferences from the evidence—that the Lodge was entitled to—that Kinsale failed to perform an adequate investigation of the incident from which to assess its insured's liability.

Beyond these fundamental departures from the settled manner in which a court must assess evidence at summary judgment, which alone warrant reversal, the district court also misunderstood Florida law in two material respects.  First, it wrongly carved an exception into the "totality of the circumstances" standard

**Podhurst Orseck, P.A.**
One S.E. 3rd Avenue, Suite 2300, Miami, FL 33131 • Miami 305.358.2800 Fax 305.358.2382 • Ft Lauderdale 954.463.4346                    www.podhurst.com

which the Florida Supreme Court has held must be employed to assess insurance

bad faith claims, mistakenly treating the threshold duty question of whether an

insured's liability was clear, such that the insurer has an affirmative duty to initiate

settlement discussions, in isolation from all of the applicable circumstances.  This

approach conflicts with Florida law.  This legal error may explain, however, why

the district court inexplicably ignored evidence that squarely created a dispute over

the core question of whether the Lodge's liability was clear.  Second, the district

court mistakenly distilled from Florida law the notion that in order for an insured's

liability to be considered "clear," it must be at least 80%.  There is no support in

Florida law for this unduly rigid formulation of "clear" liability.  Not only was

there ample evidence in the record at summary judgment that the circumstances

presented a case of clear premises liability against the Lodge, but the state court

jury found it to have been 70% at fault for the decedent's death.

Summary judgment should not have been entered in this case, and the Lodge

should be permitted to take its bad faith counterclaim to trial.

## STANDARD OF REVIEW

This Court has summarized the governing standard as follows:

> We review the district court's grant of summary judgment de
> novo, viewing all evidence and drawing all reasonable factual
> inferences in favor of the nonmoving party.  *Chapman v. AI Transp*.,
> 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc).  Summary judgment
> is appropriate where there are no genuine issues of material fact and
> the movant is entitled to judgment as a matter of law.  *Id.*  In other

**Podhurst Orseck, P.A.**
One S.E. 3rd Avenue, Suite 2300, Miami, FL 33131 • Miami 305.358.2800 Fax 305.358.2382 • Ft Lauderdale 954.463.4346                www.podhurst.com

words, "[t]he District Court [must] consider all evidence in the record when reviewing a motion for summary judgment—pleadings, depositions, interrogatories, affidavits, etc.—and can only grant summary judgment if everything in the record demonstrates that no genuine issue of material fact exists." *Tippens v. Celotex Corp.*, 805 F.2d 949, 952 (11th Cir. 1986) (internal citation and quotation omitted). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986).

*Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012). Further, "[e]ven if an inference is not necessarily the most plausible, at this stage of the litigation we must take not only the facts but also the inferences that we draw from those facts in the light most favorable to the nonmoving party below." *Valderrama v. Rousseau*, 780 F.3d 1108, 1120 n.4 (11th Cir. 2015).

## <u>ARGUMENT</u>

## I.  THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT BASED ON A ONE-SIDED VIEW OF THE EVIDENCE

The district court granted Kinsale summary judgment without referencing *any* of the evidence that the Lodge submitted in opposition to the motion for summary judgment. Among other things, the Lodge introduced the deposition testimony of multiple witnesses, all of whom explained that they viewed the Lodge's liability for the shooting as clear. A court must "consider *all* evidence in the record when reviewing a motion for summary judgment ... and can only grant

**Podhurst Orseck, P.A.**
One S.E. 3rd Avenue, Suite 2300, Miami, FL 33131 • Miami 305.358.2800 Fax 305.358.2382 • Ft Lauderdale 954.463.4346    www.podhurst.com

summary judgment if *everything in the record* demonstrates that no genuine issue of material fact exists." *Strickland*, 692 F.3d at 1154. There is no mention whatsoever in the order of any of the evidence the Lodge submitted on the issue of its liability, neither in the "Background" section  nor the "Discussion" section. *See* DE 142 at 1-5, 8-10. So, the only way the district court's willingness to ignore the non-movants' evidence could *not* be reversible error is if that evidence were legally immaterial.

The district court's opinion offers no explanation for why it ignored this evidence, and none of the reasoned explanations that could conceivably justify such a departure from the fundamentals of summary judgment standards holds water. Nothing in Florida insurance bad faith law permits a court to ignore competent evidence that tends to show that an insurer violated the fiduciary duty it owed to its insured. That duty arises from the circumstances, and the totality of the circumstances determines whether an insurer has violated its duty. The failure to consider the totality of the circumstances at summary judgment, when presented through competent evidence, constitutes reversible error.[5]

The following sections address four distinct errors in the district court's analysis. First, the court failed to appreciate that under Florida law, in a bad faith

---

[5] Because this is a diversity case, Florida substantive law governs. *Eres v. Progressive Am. Ins. Co.*, 998 F. 3d 1273, 1278 n.4 (11th Cir. 2021).

**Podhurst Orseck, P.A.**
One S.E. 3rd Avenue, Suite 2300, Miami, FL 33131 • Miami 305.358.2800 Fax 305.358.2382 • Ft Lauderdale 954.463.4346                    www.podhurst.com

case where no demand was made for the insurance proceeds, the threshold issue of

whether an affirmative duty to offer to settle the claim arose must be assessed

according to the totality of the circumstances, not in isolation.  *See* Part I.A., *infra*.

Second, the court improperly discounted evidence the Lodge submitted from which

it could reasonably be inferred that Kinsale's investigation into the Lodge's

liability was inadequate.  *See* Part I.B., *infra*.  Third, the court ignored the Lodge's

evidence indicating that it faced clear premises liability for its negligence, such that

an affirmative duty arose for Kinsale to offer to settle the claim, before the Estate

filed suit and even in the absence of a demand for settlement.  *See* Part I.C., *infra*.

Finally, the court departed from Florida law by utilizing much too rigid a

conception of what "clear" liability means.  *See* Part I.D., *infra*.

### A.    The District Court's Errant Analysis Begins from a Failure to Recognize That Under Florida Law a Court Must Consider the Totality of the Circumstances to Determine Whether an Affirmative Duty to Settle a Potential Claim Arises

The district court seems to have premised its ruling on the notion that no

duty ever arose for Kinsale—to offer to pay its $50,000 insurance proceeds to

Oliver to eliminate a potential claim against its insured—because, as the court

found, "liability was for the Lodge was never clear."  DE 142 at 9.  Obviously, if

there were no duty at all, there can be no valid bad faith claim.  *See McNamara v.*

*Gov't Emps. Ins. Co.*, 30 F.4th 1055, 1059 (11th Cir. 2022) (duty is an element of

an insurance bad faith claim) (citing *Boston Old Colony Ins. Co. v. Gutierrez*, 386

So.2d 783, 785 (Fla. 1980)). However, nothing in Florida law would justify ascertaining whether an affirmative duty arose without considering the totality of the circumstances bearing on that question. The district court appears to have believed that a court is not supposed to consider the totality of the circumstances in assessing whether that affirmative duty arose, but only afterwards. *See* DE 142 at 9 (implying that "the broader 'totality of the circumstances' standard governing bad faith claims" only applies "*once* an insurer had an affirmative duty to enter into settlement negotiations" and reasoning that the determination of "whether liability for the insured was clear" must be made "before moving on to further analysis") (emphasis added). By separating the threshold duty question from a review of the totality of the circumstances, the district court departed from Florida law.

To appreciate this error, it is helpful to start from first principles of Florida insurance law. An insurer owes its insured certain duties by virtue of their contractual relationship. At its most basic level, "[t]his relationship imposes upon the insurer the duty … to act honestly and in good faith toward the insured." *Auto. Mut. Indem. Co. v. Shaw*, 184 So. 852, 859 (Fla. 1938). As the Florida Supreme Court most recently explained:

> This duty arises from the nature of the insurer's role in handling the claim in the insured's behalf—because the insured "has surrendered to the insurer all control over the handling of the claim, including all decisions with regard to litigation and settlement, then the insurer

23

> must assume a duty to exercise such control and make such decisions
> in good faith and with due regard for the interests of the insured.

*Harvey v. GEICO Gen. Ins. Co.*, 259 So. 3d 1, 6 (Fla. 2018) (quoting *Boston Old*

*Colony*, 386 So. 2d at 785).  This "'fiduciary duty'" requires an insurer to "'act in

the insured['s] best interests,'" something the insured naturally "'expects when

paying premiums.'"  *Harvey*, 259 So. 3d at 7 (quoting *Berges v. Infinity Ins. Co.*,

896 So. 2d 665, 683 (Fla. 2005)).

Among an insurer's first duties is to "'investigate the facts'" of a potential

claim.  *Id.* (quoting *Boston Old Colony*, 386 So. 2d at 785).  With respect to the

distinct but related duty to settle a claim, Florida law distinguishes between cases

where the victim has made a demand against the policy versus those where no

demand has been made.  A demand on the policy triggers a cascade of other duties.

*See id.* at 6-7.[6]  In cases without a demand, like here, "'an insurer has an

---

[6] Specifically, the various obligations comprised in an insurer's good faith duty to
its insured are:

> to advise the insured of settlement opportunities, to advise as to
> the probable outcome of the litigation, to warn of the possibility
> of an excess judgment, and to advise the insured of any steps he
> might take to avoid same.  The insurer must investigate the
> facts, give fair consideration to a settlement offer that is not
> unreasonable under the facts, and settle, if possible, where a
> reasonably prudent person, faced with the prospect of paying
> the total recovery, would do so.

*Harvey*, 259 So. 3d at 6-7 (internal quotation marks and citation omitted).  "[T]he
critical inquiry in a bad faith [case] is whether the insurer diligently, and with the

24

affirmative duty to initiate settlement negotiations'" "'[w]here liability is clear, and injuries so serious that a judgment in excess of the policy limits is likely.'" *Id*. at 7 (quoting *Powell*, 584 So. 2d at 14). Whether or not such an affirmative duty to settle arises in a no-demand case must be evaluated under the totality of the circumstances.

The Florida Supreme Court's decision in *Harvey* makes that clear. *Harvey* was a no-demand case: the victim's counsel never made a settlement offer before filing suit. Counsel only sought permission to take a recorded statement of the insured, shortly after which the insurer, GEICO, tendered the full amount of the policy limits. *Id*. at 4; *see id*. at 19 (Canady, C.J., dissenting) (noting that the claimant never made a settlement demand). After GEICO delayed in making the insured available for the statement, the victim's counsel returned the settlement check and filed suit against the insured. *Id*. at 5.

The *Harvey* court treated these circumstances as a no-demand case, using it as the occasion to embrace *Powell* for the first time. In setting forth Florida insurance bad faith law, the court stated:

> In a case "[w]here liability is clear, and injuries so serious that a judgment in excess of the policy limits is likely, an insurer has an affirmative duty to initiate settlement negotiations." *Powell v. Prudential Prop. & Cas. Ins. Co.*, 584 So. 2d 12, 14 (Fla. [Dist. Ct. App.] 1991)). In such a case, where "[t]he financial exposure [to the

same haste and precision as if it were in the insured's shoes, worked on the insured's behalf to avoid an excess judgment." *Id.* at 7.

**Podhurst Orseck, P.A.**
One S.E. 3rd Avenue, Suite 2300, Miami, FL 33131 • Miami 305.358.2800 Fax 305.358.2382 • Ft Lauderdale 954.463.4346                www.podhurst.com

insured] [i]s a ticking financial time bomb" and "[s]uit c[an] be filed
at any time," any "delay in making an offer under the circumstances
of this case even where there was no assurance that the claim could be
settled could be viewed by a fact finder as evidence of bad faith."
*Goheagan v. Am. Vehicle Ins. Co.*, 107 So. 3d 433, 439 (Fla. [Dist. Ct.
App.] 2012) (citing *Boston Old Colony*, 386 So. 2d at 785).

*Harvey*, 259 So. 3d at 7. The court proceeded to evaluate the evidence "[u]nder

the totality of the circumstances," notwithstanding that it was a case of "clear"

liability and substantial damages, such that the insurer had "to act as if the financial

exposure to [its insured] was a 'ticking financial time bomb.'" *Id.* at 8 (quoting

*Goheagan*, 107 So. 3d at 439). And the first thing the court considered pursuant to

that analysis was what "GEICO's independent investigation of the facts revealed."

*Id.*[7]

In this case, as noted earlier, the district court refused to consider the totality

of the circumstances. This legally flawed approach yielded further error in

ascertaining whether Kinsale had an affirmative duty to initiate settlement

discussions, in several respects. First, the district court failed to appreciate that an

insurer's investigation can affect its assessment of the liability picture. A failure to

investigate adequately can produce an unreliable assessment of its insured's

liability, as occurred here. Second, the district court selectively focused on

---

[7] GEICO's investigation happened to reveal that liability was "clear," because
GEICO knew that its insured "was at fault for the accident." *Harvey*, 259 So. 3d at
8.

Kinsale's subjective belief about its insured's liability, rather than considering the totality of the circumstances (and evidence) bearing on an objective assessment of whether this was a case of "clear" liability. These errors are developed separately in Parts B and C below.

### B. The District Court Mistakenly Discounted the Evidence of Kinsale's Inadequate Investigation of Its Insured's Liability

The Lodge's theory of the case at summary judgment was that any reasonable assessment of the Lodge's liability on a premises-liability claim should have been immediately clear, but that Kinsale failed to appreciate that reality due to its inadequate investigation. *See* DE 115 (Lodge's Resp.) at 1 (accusing Kinsale of "burying its head in the sand" for nine months before suit was filed); *id*. at 2 (noting "Kinsale's repeated failures to conduct its own claim investigation"); *id*. at 18 ("Had Kinsale conducted its own investigation of the Oliver claim, it should have realized that the claim presented clear liability to the Lodge."); *id*. at 16-17 (summarizing the evidence of the flaws in Kinsale's investigation); *see also* DE 108 (Reed's Resp.) at 7-8 (detailing Kinsale's investigation failures, including among other things that it "failed to interview witnesses, failed to do the most cursory security risk assessment on receipt of the claim, [and] failed to communicate with Tanya Oliver's counsel after December 3, 2015").

Under the totality of circumstances of a particular case, the facts bearing on the adequacy of an insurer's investigation of a potential claim may certainly affect

the insurer's assessment of its insured's liability.  *See Harvey*, 259 So. 3d at 8 ("In a bad faith case, the evidence must be viewed in the context of the circumstances of each particular case.").  It makes perfect sense that the duties to investigate and to initiate settlement negotiations are linked: the whole purpose of the investigation is to place the insurer in a position to be able to discharge its fiduciary duties to its insured.  *See Alt v. Am. Family Mut. Ins. Co.*, 237 N.W.2d 706, 712 (Wis. 1976) (noting that the duties to investigate and to settle are "intimately related") (cited in *Powell*, 584 So. 2d at 14).  In a case where no insurance demand for policy limits has been made, the investigation is designed to place the insurer in a position to know whether liability against its insured is "clear" such that, if the loss involved "'injuries so serious that a judgment in excess of the policy limits is likely,'" *Harvey*, 259 So. 3d at 7 (quoting *Powell*, 584 So. 2d at 14), the insurer must not delay in making a settlement offer to the victim.  And where an insurer drops the ball on an investigation, it may fail to appreciate the clarity of the liability picture, and not initiate settlement discussions with the victim, thereby potentially depriving its insured of an opportunity to resolve the foreseeable claim for the policy limits.

The Lodge marshaled evidence at summary judgment that creates a genuine issue of material fact concerning whether Kinsale performed an adequate

**Podhurst Orseck, P.A.**
One S.E. 3rd Avenue, Suite 2300, Miami, FL 33131 • Miami 305.358.2800 Fax 305.358.2382 • Ft Lauderdale 954.463.4346                www.podhurst.com

investigation.[8]  The Lodge asserted that Kinsale failed to conduct an adequate

investigation into the Lodge's liability for the shooting.  That theory of the case is

primarily based on Kinsale's claims adjuster's contemporaneous notes, which

document a threadbare investigation, and testimony by multiple witnesses that the

basic facts of how the shooting occurred created an obvious case of premises

liability against the Lodge.  As evidence that Kinsale's investigation was

inadequate, the Lodge pointed first to Kinsale's adjuster Thrift's contemporaneous

notes.  DE 115 at 16 (citing DE 107, ¶ 81 (citing DE 98 (Claim Notes) at 31)).

Notably absent from Thrift's notes is any evidence that Kinsale undertook its own

robust investigation into what liability the Lodge had for the shooting.  Rather,

Thrift relied heavily upon a separate investigation that the insurer with the liquor-

liability coverage for the Lodge, Mount Vernon, undertook.  DE 115 at 17.  Thrift

understood that Mount Vernon's local field investigator, Danowit, was

"investigating for the liquor liability policy," *id*. (citing DE 98 (Claims Notes) at

30-31), a materially different focus than Kinsale's general commercial liability

policy, which provided coverage for a loss resulting from an assault and battery.

*See* DE 1-3 (Kinsale policy) at 36; *see also* DE 93 (Alfeche Dep.) at 32:24-33:17

---

[8] There is no dispute, incidentally, that Kinsale understood from the time it
received Landy's letter demanding insurance coverage information that it
represented a potential claim against the Lodge.  *See* DE 98 (Thrift Decl.) at 2, ¶ 6;
DE 98 at 18.  It therefore understood that it had a duty to investigate the claim.  DE
87 (Thrift Depo.) at 59:20-21.

Podhurst Orseck, P.A.
One S.E. 3rd Avenue, Suite 2300, Miami, FL 33131 • Miami 305.358.2800 Fax 305.358.2382 • Ft Lauderdale 954.463.4346                    www.podhurst.com

(describing the written liquor-liability assignment, related investigation, and desire to "rule out" allegations regarding service to a habitual drunkard or a minor); *id.* at 122:20-123:5 (discussing written guidelines for handling liquor-liability claims); *id.* at 169:2-173:3, 176:19-177:2 (discussing elements of liquor-liability investigation based on written guidelines for the handling of such claims and Danowit's investigation of licenses pursuant to the written guidelines).[9] Mount Vernon's policy also had an exclusion for general liability arising from the use of a firearm. DE 94 at 21.

The district court acknowledged that "[the Estate] and the Lodge dispute the adequacy of Kinsale's investigation" (DE 142 at 8), but proceeded to give extremely short shrift to the evidence they marshaled. Indeed, the only reference to and analysis of any of the Appellants' evidence appears in a footnote in the "Background" section of the opinion, in which the court refused to view the parties' dispute over the scope of the Mount Vernon investigation in the light most

---

[9] Under Florida law, liability for serving alcohol to patrons is very different than premises liability for negligent security. An establishment that serves alcoholic beverages can be liable for injury caused by that person's intoxication only if it willfully served an underaged person or knowingly served a habitual alcoholic. § 768.125, Fla. Stat.; *Evans v. McCabe 415, Inc.*, 168 So. 3d 238, 239 (Fla. Dist. Ct. App. 2015). By contrast, "[a] defendant's duty of care in a premises liability action depends on the plaintiff's 'status' on the land," and if an invitee, the foreseeability of criminal attacks on the premises. *Sapp v. United States*, No. 21-12282, 2022 WL 110227, at *2 (11th Cir. Jan. 1, 2022) (following Florida law).

**Podhurst Orseck, P.A.**
One S.E. 3rd Avenue, Suite 2300, Miami, FL 33131 • Miami 305.358.2800 Fax 305.358.2382 • Ft Lauderdale 954.463.4346                    www.podhurst.com

favorable to the Appellants—the *non*-movants at summary judgment.  *See* DE 142 at 3 n.4.  While Kinsale relied on testimony that Mount Vernon's investigation was being done for Kinsale's benefit too, Appellants pointed out that Danowit's reports could be read as "tailored toward whether Mount Vernon's liquor liability policy was potentially implicated."  DE 115 at 17; DE 107 at 7-8 (Reed's statement of material facts), ¶¶ 74-76; DE 114 at 1 (Lodge's adoption thereof).

The district court rejected the notion that the reports could be seen as evidence that Danowit was really only working for Mount Vernon and focusing on the question of liability for serving liquor.  In the court's view, the reports did not "properly *contradict*[] Kinsale's statements regarding Danowit's investigation" because they also contained a reference, for instance, to a "'comprehensive general liability/bodily injury claim.'"  DE 142 at 3 n.4 (emphasis added) (quoting DE 95 at 53).  But that reference in the report was inconsistent with Mitchell Claims having been retained to conduct a "liquor liability assignment" only, since Mount Vernon did not have general liability coverage for the Lodge.  *See* DE 93 at 121 (liquor-liability assignment, cited in DE 107, ¶ 73).  Another of Danowit's reports described Kinsale's separate "investigation [as] parallel[ing] our investigation," suggesting that the two were independent.  DE 95 at 64 (cited in DE 107, ¶ 76).

Given the lack of clarity of the documentation over the scope of the Mount Vernon investigation, the Appellants as non-movants were entitled to the fair

**Podhurst Orseck, P.A.**
One S.E. 3rd Avenue, Suite 2300, Miami, FL 33131 • Miami 305.358.2800 Fax 305.358.2382 • Ft Lauderdale 954.463.4346                    www.podhurst.com

inference that Mount Vernon had not agreed to perform a premises-liability-focused investigation on Kinsale's behalf.  The district court evidently was unpersuaded by that inference, but at the summary judgment stage, "[e]ven if an inference is not necessarily the most plausible," the court "must take … the inferences … draw[n] from th[e] facts in the light most favorable to the nonmoving party below." *Valderrama*, 780 F.3d at 1120 n.4.  On the flip side, a court may only "discard[] a party's account when the account 'is inherently incredible and could not support reasonable inferences sufficient to create an issue of fact.'" *Morton v. Kirkwood*, 707 F.3d 1276, 1284 (11th Cir. 2013) (quoting *Riley v. City of Montgomery*, 104 F.3d 1247, 1251 (11th Cir. 1997)).  The district court's apparent willingness to disregard the ambiguity over the scope of the Mount Vernon investigation, and whether it could plug a gaping hole in Kinsale's investigation, was error.

Irrespective of that issue, the district court separately erred by treating Danowit's reports as though they were the only evidence Appellants relied on to dispute the adequacy of Kinsale's investigation.  But they were not.  Appellants also pointed to the fact that Kinsale's internal Claims Notes reflected virtually no independent investigation, and that Thrift's statement in her notes that Danowit "is investigating for the liquor liability policy" could be viewed as an admission by

Thrift that Mount Vernon was not investigating premises liability for Kinsale. DE 108 at 3 (citing DE 98 at 30); *see* DE 107 at 4, ¶ 43.

As importantly, setting aside the adequacy of the investigation, Kinsale should have known, from the outset of its claims period, that the Lodge faced clear premises liability for the shooting. The Lodge introduced substantial evidence supporting the view that it faced clear premises liability for the shooting, but the district court ruled that "[t]he undisputed facts show that liability for the Lodge was never clear." DE 142 at 9. This assessment of the record evidence as "undisputed" on this point is deeply flawed. It is addressed in the next section.

### C. The District Court Mistakenly Ignored Evidence That the Lodge Faced Clear Premises Liability for the Shooting and That Kinsale Should Have Appreciated That Risk

To reach its conclusion that it was "undisputed" in the summary judgment record that liability for the Lodge was "never clear" (DE 142 at 9), the district court had to ignore contrary evidence from multiple sources that showed that the Lodge *was* clearly liable. The failure to credit this evidence in opposition to a motion for summary judgment was error.

Kinsale learned on November 23, 2015 that the shooting occurred on the Lodge's property. DE 98 at 32 (11/23/15 1:48 PM entry ("loss location is parking lot of insured property")). By December 3, 2015, Kinsale was aware of the basic facts of the incident: that the shooter and the victim/claimant had both been

**Podhurst Orseck, P.A.**
One S.E. 3rd Avenue, Suite 2300, Miami, FL 33131 • Miami 305.358.2800 Fax 305.358.2382 • Ft Lauderdale 954.463.4346                    www.podhurst.com

invitees to the Lodge, started fighting and were escorted outside, and about ten minutes later the shooting occurred.  DE 98 at 30-31 (12/3/15 3:46 PM entry). And given Kinsale's claim to have been sharing in Danowit's investigation, Kinsale also would have known that the Lodge's security staff failed to stay outside until the women left the premises.  *See* DE 95 at 57 (reporting that the security staff "made sure everything was okay [outside] and … then proceeded to go inside the club area").

Those facts should have been alarming to Kinsale, given that a Florida premises owner owes a duty of care to its invitees, including fighting bar/club patrons who are ejected onto the property outside.[10]  It was plainly negligent for the Lodge's security staff to return inside without waiting outside to ensure that both fighting groups had left the premises.  *See* DE 107, ¶ 92 (citing Jack Depo. (DE 106) at 118:19-25; R. Witherspoon, "Security for Bars, Taverns, Lounges and Nightclubs" (Jan. 31, 2013) (DE 107-2 at 6) ("Security employees should monitor

---

[10] *See, e.g.*, *Hall v. Billy Jack's, Inc.*, 458 So. 2d 760, 761-62 (Fla. 1984) (explaining, in a case where the "fight moved outside," that a proprietor owes patrons the duty to protect them from reasonably foreseeable disorderly conduct); *Borda v. E. Coast Entm't, Inc.*, 950 So. 2d 488, 491-92 (Fla. Dist. Ct. App. 2007) (reversing directed verdict for nightclub-defendant as to liability for injuries to a club patron since jury reasonably found the club's actions in placing the plaintiff "along with her assailant together outside, and the [club] employee's inaction in the face of [the plaintiff's] request for help were the proximate cause of [her] injuries"; explaining there is a foreseeable zone of risk two "patrons [a]re ejected at the same time and placed in the same area").

the club's parking lot(s) or those close by and routinely used by the club's patrons, starting *at least* 30 minutes before closing time, and continuing until all patrons and employees have left.")).

Indeed, the Lodge introduced evidence from multiple sources that the Lodge's liability was clear.  The victim's lawyers immediately recognized the case as one involving clear liability against the Lodge.  *See* DE 107, ¶ 94 (citing DE 90 (Landy Dep.) at 30:14-21; 31-32; 64:7-19); *id*., ¶ 95 (citing DE 88 (Marlowe Dep.) at 119:3-120:5; 32:18-36:11); *id*., ¶ 96 (quoting DE 91 (Haggard Dep. 45:6-9; 63:12-17; 63:17-20)).  Their testimony on this point constitutes competent evidence at summary judgment.  *See, e.g.*, *Harvey*, 250 So. 3d at 9 (placing substantial weight on counter-factual testimony of claimant's attorney); *Moore v. GEICO Gen. Ins. Co.*, 633 F. App'x 924, 930 (11th Cir. 2016) (reversing summary judgment in bad faith case in part because district court "discounted" testimony of claimant's counsel).  Likewise, the Lodge introduced the opinion testimony of the Estate's insurance industry expert, Jack, who also testified that it was a case of clear liability.  *See* DE 106 at 118:19-25.

It was not just witnesses affiliated with the claimant who held this assessment of the Lodge's liability.  Mount Vernon's claims adjuster, Alfeche, testified that he recognized that because the Lodge was "dealing with a negligent security case in Florida," there was a high risk of a verdict for the plaintiff.  DE 93

35

at 236:7-14 (cited in DE 115 at 17; DE 107, ¶ 98).  He noted that "very seldom will you get a defense verdict" in a negligent security case in Florida.  *Id*. at 236:14-15.  Under the circumstances of this case, if Alfeche had been in Kinsale's shoes, he would have tendered the $50,000 in coverage Kinsale had for the claim, given the "very serious" injuries.  *Id*. at 235:20-236:8.  Alfeche testified that he did not see "any clear evidence of liability" *except* for the Lodge's security failings in "never ma[king] sure th[e fighters] left the premises[.]"  *Id*. at 155:8-16 (cited in DE 115 at 17).  And, after suit was filed against the Lodge, Kinsale's retained defense counsel warned in an opinion letter that "liability is difficult to overcome" in Florida premises liability cases and there was only a 15% to 20% likelihood of a favorable outcome for Kinsale.  DE 107-4 (Hamilton letter) at 3, 6.

Furthermore, Kinsale was well aware that the value of the claim against the Lodge was virtually certain to exceed the small amount of coverage available. Thrift was aware early on of the severity of Oliver's injuries and that she was a mother of three.  *See* DE 87 (Thrift Dep.) at 168:19-169:19; DE 87 at 152, 154 (news article).  Kinsale's commercial general liability insurance policy also contained an endorsement limiting coverage to just $50,000 for a claim for bodily injury arising out of assault and battery.  DE 1-3 at 36.  So, Kinsale was aware that

**Podhurst Orseck, P.A.**
One S.E. 3rd Avenue, Suite 2300, Miami, FL 33131 • Miami 305.358.2800 Fax 305.358.2382 • Ft Lauderdale 954.463.4346    www.podhurst.com

it had only $50,000 coverage for a claim involving a brain injury to a young mother.

The district court's opinion makes no mention of any of this evidence, all of which is contrary to the court's perplexing assertion that "[t]he undisputed facts show that liability for the Lodge was never clear." DE 142 at 9. This failure to credit opposing testimony was a cardinal violation at summary judgment. *Strickland*, 692 F.3d at 1154. Similarly, the failure to consider the testimony of an expert witness, Jack, who opined that the Lodge's liability was clear, was also erroneous. *See Amy v. Carnival Corp.*, 961 F.3d 1303, 1310 (11th Cir. 2016) (reversing summary judgment in part because district court "made no mention of [expert's] testimony," which "could have carried considerable weight for a jury"); *Aldana v. Progressive Am. Ins. Co.*, 828 F. App'x 663, 671-72 (11th Cir. 2020) (same in Florida insurance-bad-faith case); *Moore*, 633 F. App'x at 930 (same).

The district court offered no explanation as to why it ignored the evidence that the Lodge's liability was clear, and there is no legally valid reason for having done so. It is not as though the only evidence that was relevant was whether Kinsale *thought* the Lodge's liability was not clear. Perhaps that is what the court mistakenly believed. *See* DE 142 at 9 (stating that "[a]t no point during the claim investigation did Kinsale or Mitchell Claims ever consider the Lodge liable"). Only by eliminating the claimant's counsel's testimony about their assessments of

the Lodge's liability could the district court conceivably assert that "none of the parties who looked into the Lodge's liability ever suggested that the Lodge might bear more than questionable liability." *Id*. at 9-10.[11]

However, an insurer's affirmative duty to try to settle a claim against its insured arises when the insured's liability "is" clear, *Harvey*, 259 So. 3d at 7, not just when the insurer *believes* it to be. That statement of the law is consistent with the principle that an insurer's conduct is measured according to an objective standard: how a "'reasonably prudent person'" would act. *Id.* (quoting *Boston Old Colony*, 386 So. 2d at 785); *see Campbell v. Gov't Empl. Ins. Co.*, 306 So. 2d 525, 530 (Fla. 1974) (explaining that "reasonable diligence" is "material in determining bad faith"). If it were otherwise, an insurer who unreasonably investigated a claim, and thereby remained ignorant of the clear liability of its insured, would have no duty to initiate settlement discussions. It is the "totality of the circumstances" that is relevant, *Harvey*, 259 So. 3d at 8, not just those circumstances which an insurer appreciated. Consequently, it was error for the district court to have failed to

---

[11] As the opinion recites, Kinsale argued that it (and others) did not "believe[]" that the Lodge was clearly liable. DE 142 at 8. Kinsale adopted that subjective approach in its argument. *See* DE 100 at 8; DE 124 at 2, 6, 8, 15.

**Podhurst Orseck, P.A.**
One S.E. 3rd Avenue, Suite 2300, Miami, FL 33131 • Miami 305.358.2800 Fax 305.358.2382 • Ft Lauderdale 954.463.4346    www.podhurst.com

credit, as countervailing evidence at summary judgment, the evidence the Lodge

marshaled which tends to show that its liability was clear.

### D.    The District Court Insisted Upon Too Rigid a Standard for What Constitutes "Clear" Liability

The district court also based its decision on the legally erroneous view that

"clear" liability means at least 80% likely.  DE 142 at 9-10 (noting that "the

insurance company in *Powell* evaluated liability for its insured 'as 80%–100%'"

and that "a jury ultimately found the Lodge *only* 70% liable") (emphasis added).

Florida courts have never established a strict numerical threshold for what "clear"

liability means, and that rigid approach makes no sense given the impossibility of

reducing multi-variate estimates of probabilistic outcomes down to some numerical

scale.  While the insurer in *Powell* did, indeed, "evaluate Powell's liability as

80%–100%," 584 So. 2d at 13, the court in adopting a "clear" standard in no way

suggested that it implicated such a precise prognostication of the likelihood of an

adverse liability finding or that such numbers constituted the floor for what is

clear.  *Cf. Welford v. Liberty Mut. Ins. Corp.*, 190 F. Supp. 3d 1085, 1098 (N.D.

Fla. 2016) (noting that "[i]t is not necessary … to determine what constitutes

'clear' liability in percentage terms" when, "by any objective measure, liability

**Podhurst Orseck, P.A.**
One S.E. 3rd Avenue, Suite 2300, Miami, FL 33131 • Miami 305.358.2800 Fax 305.358.2382 • Ft Lauderdale 954.463.4346    www.podhurst.com

was not 'clear' on the facts of this case"), *aff'd*, 713 F. App'x 969 (11th Cir. 2017).[12]

The term "clear" is best understood as a form of confidence interval. In the context of discussing the notion of "clear and convincing" evidence, the Florida Supreme Court has explained that the standard involves an interval of confidence greater than a mere preponderance of the evidence but less than beyond a reasonable doubt. *See Allstate Ins. Co. v. Vanater*, 297 So. 2d 293, 295-96 (Fla. 1974).

*Powell* invoked another case which held that an insurer has an affirmative duty to initiate settlement discussions where there was only a high likelihood that its insured would be found liable. *See Powell*, 584 So. 2d at 14 (citing *Rova Farms Resort, Inc. v. Investors Ins. Co.*, 323 A.2d 495 (N.J. 1974)). In *Rova Farms*, the

---

[12] In *Welford*, this Court affirmed a summary judgment in favor of an insurer in a no-demand case under materially different circumstances. Unlike Kinsale here, the insurer in *Welford*, Liberty Mutual, lacked notice that its insured had been involved in an injury-producing accident until after the victim filed suit. Unlike Landy here, Welford's counsel "did not contact Liberty," 713 F. App'x at 973, thereby placing it on notice. And when Liberty's insured later informed it of the accident, which involved someone else's car hitting three pedestrians, she informed the company that her car "was not involved in the accident." *Id*. Under those circumstances, the Court ruled that "Liberty's failure to initiate its own investigation at this point was, at worst, negligent[.]" *Id*. Within four days of the date Liberty first learned of the claim against its insured, Liberty investigated and offered to settle for the policy limits. *Id*. Applying the *Powell* doctrine, the Court reasoned: "Given Liberty's otherwise diligent efforts and the circumstances surrounding the accident, Liberty's initial failure to investigate the case and make a pre-suit settlement offer are insufficient to establish bad faith." *Id*. at 973-74.

40

Supreme Court of New Jersey held that because an insured is at the mercy of its insurer over the use of the policy funds, and because generally speaking an insured's degree of fault is inversely related to the insurance company's willingness to settle (i.e., "the more faultless the [insured] seems to have been the more feasibly he may be subjected by the [insurance] company to a trial of the case and all the dangers it entails," *id*. at 498-99), the duty of good faith requires an insurer affirmatively to explore settlement of the claim, even before settlement demand is made, if based on "[a]ll the factors bearing upon the advisability of a settlement for the protection of the insured," it is objectively and realistically appropriate, *id*. at 489-90.  "[A]s to liability, the question is not whether the carrier, its attorney, or the insured considers a defendant liable but that the jury could be justified in finding [the insured liable] from the evidence."  *Id*. at 490.  The claimant in *Rova Farms* dove from a diving platform into a murky lake on the resort's property, unaware that the water was only four feet deep, and suffered a paralyzing neck injury.  *Id*. at 498.  Confident in a contributory negligence finding, the insurer evaluated the case as "a 'no liability' case," or more particularly a "severe injury—weak liability" case.  *Id*. at 503 & n.5.  Yet the defense counsel hired by the insurer privately expressed misgivings about the risk of a jury verdict for the plaintiff.  *Id*. at 502.  As the court in *Powell* aptly summarized, *Rova Farms* was a case "where substantial injuries and *potential* liability of [the] insured [we]re

41

obvious." 584 So. 2d at 14 (emphasis added). This reference supports the understanding that the *Powell* court's conception of a case with "clear" liability includes one with obvious potential for an adverse verdict.

In this case, there was ample record evidence that the liability case against the Lodge was sufficiently clear that there was an obvious potential for a judgment far in excess of the Lodge's $50,000 policy limits. The shooting took place between invitees of the Lodge on its property, and the Lodge's principal told Kinsale that there had been prior incidents in the past. DE 98 at 31. Mount Vernon's investigation, which Kinsale said it was aware of, revealed that the Lodge's security personnel failed to wait outside to ensure that the fighting parties had left the Lodge's parking lot, a breach of industry practice. *See* DE 95 at 57 (Danowit's December 30, 2015 Report); DE 102-1 (Jack Report) at 4 (noting that the "lack of parking lot security that night [of the incident] is evident throughout the pre-suit investigation documented in both the Kinsale and Mount Vernon claim files"); DE 107-2 at 6 (discussing industry standards regarding security for bars and nightclubs and stressing importance of monitoring parking lots and areas outside the bar space to minimize risk of incidents). These facts alone present a strong case for negligent security under Florida law. *See* DE 107, ¶ 94 (citing DE 90 (Landy Dep.) at 30:14-21, 31-32, 64:7-19); *id.*, ¶ 95 (citing DE 88 (Marlowe Dep.) at 32:18-36:11, 119:3-120:5); *id.*, ¶ 96 (quoting DE 91 (Haggard

Dep.) at 45:6-9, 63:12-20); DE 102-1 (Jack Report) at 4; *see, e.g.*, *Borda*, 950 So. 2d at 491-92 (jury reasonably found the defendant-lounge's actions in placing the plaintiff and her assailants together outside, after plaintiff had already been accosted by the same people inside the lounge, were the proximate cause of injuries). Coupled with the tremendous damages likely to flow from the catastrophic injury of a shooting to the head to a mother of three children, and the availability of just $50,000 in insurance, this case satisfied the *Powell* standard of one "where liability is clear, and injuries so serious that a judgment in excess of the policy limits is likely," 584 So. 2d at 14.

None of the reasons the district court gave for reaching the opposite conclusion withstand scrutiny. First, putting aside the error in discounting the evidence of the claimant's counsel's perspective, *see* Part I.C., *supra*, the court was not even correct to remark that "none of the parties who looked into the Lodge's liability ever suggested that the Lodge might bear more than questionable liability," DE 142 at 9-10. The Lodge's own insurer-appointed defense counsel reached the conclusion after his initial evaluation of the case that Kinsale's chances of success were as low as 15% to 20%. DE 107-4 at 3. Second, the jury's ultimate finding of 70% fault on the Lodge is fully in keeping with the notion of "clear" liability. Third, contrary to the court's conclusion, the fact that the Estate waited over a year after the shooting to file suit does not "cut[] against" the notion of clear

43

liability, DE 142 at 10. There are numerous reasons that contribute to the delay in filing a personal injury (and later wrongful death) suit that have nothing to do with the extent of a defendant's liability, ranging from a victim's family's natural focus upon the medical, emotional, and financial strains that have befallen them to the practicalities of investigating the case and the liability of other potential defendants, retaining appropriate experts, and opening an estate and appointing a personal representative, to name a few. It was Kinsale who suggested as a matter of argument, not evidence, that the passage of time somehow reflected the degree of clarity of the Lodge's liability, *see* DE 114 at 13, and, to the extent the connection is even fair game, the district court's embrace of Kinsale's speculation contravened its obligation at summary judgment to construe the evidence, and any reasonable inferences arising from it, *against* the movant.

In sum, when the totality of the circumstances is considered, a jury could reasonably conclude that Kinsale should have known that its insured faced a case of clear liability and that an excess judgment was likely, such that it had an obligation to offer to settle the claim against the Lodge even in the absence of a demand for policy limits.

**Podhurst Orseck, P.A.**
One S.E. 3rd Avenue, Suite 2300, Miami, FL 33131 • Miami 305.358.2800 Fax 305.358.2382 • Ft Lauderdale 954.463.4346                                                www.podhurst.com

## **CONCLUSION**

For the foregoing reasons, the summary judgment in Kinsale's favor should be reversed and this case allowed to proceed to trial so that a jury can resolve the genuine issues of material fact concerning whether Kinsale acted in bad faith.

DATED:  October 26, 2022

Respectfully submitted,

/s/ *Stephen F. Rosenthal*

| | |
|---|---|
| Fred A. Cunningham | Stephen F. Rosenthal |
| Florida Bar No. 775487 | Florida Bar No. 131458 |
| Matthew T. Christ | Christina H. Martinez |
| Florida Bar No. 119106 | Florida Bar No. 1029432 |
| DOMNICK CUNNINGHAM | PODHURST ORSECK, P.A. |
| & WHALEN | 1 S.E. 3rd Avenue, Suite 2300 |
| 2401 PGA Boulevard, Suite 140 | Miami, Florida 33130 |
| Palm Beach Gardens, Florida 33410 | Tel.: 305-358-2800 |
| Tel.: 561-625-6260 | srosenthal@podhurst.com |
| fred@dcwlaw.com | cmartinez@podhurst.com |
| mtc@dcwlaw.com | |

*Counsel for Appellant Pride of St. Lucie Lodge 1189, Inc.*

**Podhurst Orseck, P.A.**
One S.E. 3rd Avenue, Suite 2300, Miami, FL 33131 • Miami 305.358.2800 Fax 305.358.2382 • Ft Lauderdale 954.463.4346                    www.podhurst.com

## **CERTIFICATE OF COMPLIANCE**

Counsel for Appellant hereby certifies that the type style utilized in this brief is 14-point Times New Roman proportionally spaced, and there are 10,167 words in the response.

/s/  *Stephen F. Rosenthal*
Stephen F. Rosenthal

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on October 26, 2022, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

/s/     *Stephen F. Rosenthal*
Stephen F. Rosenthal

46

## **SERVICE LIST**

Sina Bahadoran, Esq.
Daniel R. Lever, Esq
Aaron Warren, Esq.
Clyde & Co US LLP
1221 Brickell Avenue
Suite 1600
Miami, Florida 33131
Phone: 305.446.2646
Sina.Bahadoran@clydeco.us
Aaron.Warren@clydeco.us
Dan.Lever@clydeco.us
*Counsel for Plaintiff/Counter-Defendant,*
*Kinsale Insurance Company*

Jim Blecke, Esq.
THE HAGGARD LAW FIRM
330 Alhambra Circle
Coral Gables, Florida 33134
T: 305.446.5700
D: 786.536.3348
JCB@haggardlawfirm.com
MAH@haggardlawfirm.com
AUrrutia@haggardlawfirm.com
APortell@haggardlawfirm.com
*Counsel for Defendant/Counterclaimant*
*Teaira Nicole Reed*

**Podhurst Orseck, P.A.**
One S.E. 3rd Avenue, Suite 2300, Miami, FL 33131 • Miami 305.358.2800 Fax 305.358.2382 • Ft Lauderdale 954.463.4346                    www.podhurst.com