**No. 22-12675**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

---

PRIDE OF ST. LUCIE LODGE 1189, INC., and
TEAIRA NICOLE REED,

*Defendants-Appellants,*

v.

KINSALE INSURANCE COMPANY,

*Plaintiff-Appellee*

---

On Appeal from the United States District Court for the
Southern District of Florida
No. 2:21-cv-14053
Honorable K. Michael Moore

---

## ANSWER BRIEF OF PLAINTIFF-APPELLEE
## KINSALE INSURANCE COMPANY

---

SINA BAHADORAN
Florida Bar No. 523364
sina.bahadoran@clydeco.us
AARON WARREN
Florida Bar No. 96162
aaron.warren@clydeco.us

CLYDE & CO US LLP
1221 Brickell Avenue
Suite 1600
Miami, Florida 33131
T: 305.446.2646

January 31, 2023

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1 and 11th Cir. R. 26.1-1, Kinsale Insurance Company provides this certificate of interested persons and corporate disclosure statement:

Bahadoran, Sina, counsel for Appellee

Blecke, James C., counsel for an Appellant

Christ, Matthew T., counsel for an Appellant

Clyde & Co US, LLP, law firm for Appellee

Cunningham, Fred A., counsel for an Appellant

Domnick Cunningham & Whalen, law firm for an Appellant

Haggard, Michael A., counsel for an Appellant

Kinsale Capital Group, Inc. ("KNSL") is a publicly held corporation that owns 100% of Kinsale Insurance Company

Kinsale Insurance Company, Appellee

Lever, Daniel R., counsel for Appellee

Maynard, Hon. Shaniek M., Magistrate Judge

Moore, K. Michael, District Judge

Podhurst Orseck, P.A., counsel for an Appellant

Pride of St. Lucie Lodge 1189, Inc., an Appellant

Reed, Teaira Nicole, Personal Representative of the Estate of Tanya Renee Oliver, an Appellant

Rosenthal, Stephen F., counsel for an Appellant

The Haggard Law Firm, P.A., law firm for an Appellant

Warren, Aaron, counsel for Appellee

## STATEMENT REGARDING ORAL ARGUMENT

Appellee does not believe the disposition of this appeal would be aided by oral argument. The district court's opinion was informed by reviewing the undisputed record evidence. To the extent the Court believes oral argument would in any way assist its inquiry, Appellee stands ready.

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ........................................................................................1

JURISDICTIONAL STATEMENT .............................................................2

STATEMENT OF THE ISSUES...................................................................2

STATEMENT OF THE CASE AND FACTS ...............................................2

    A.   The Drive-By Shooting .................................................................2

    B.   The Police Investigation................................................................3

    C.   Letter Of Representation From Reed's First Lawyer .................4

    D.   The Lodge's Policies With Kinsale and Mount Vernon..........5

    E.   The Lodge's First Notice to Kinsale ...........................................5

    F.   Kinsale's And Mount Vernon's Investigation .........................6

    G.   Liability Against the Lodge ........................................................13

    H.   Landy Declines Reed's Case........................................................15

    I.   The "Set Up" Of Kinsale.............................................................16

    J.   The Judgment For Reed .............................................................17

    K.   The Bad Faith Claim Against Kinsale .....................................17

    L.   Kinsale's Motion for Summary Judgment................................18

    M.   Kinsale's Undisputed Material Facts .......................................18

    N.   Reed And The Lodge's Response To Kinsale's Motion
        For Summary Judgment .............................................................20

    O.   The District Court's Order .........................................................21

SUMMARY OF THE ARGUMENT ...................................................21

STANDARD OF REVIEW ............................................................22

ARGUMENT AND CITATION OF AUTHORITY ...............................23

I.    THE DISTRICT COURT CORRECTLY HELD NO
      REASONABLE JURY COULD CONCLUDE KINSALE ACTED
      IN BAD FAITH IN HANDLING THE LODGE'S CLAIM ......................23

      A.  Unlike A Case Involving Traditional Bad Faith, Kinsale Can
          Only Be Liable If The Lodge's Liability Was "Clear." .......................23

      B.  The Undisputed Record Evidence Supports Affirmance Of
          The District Court's Order ...................................................29

      C.  Appellants' Proposed Interpretation of "Clear" Liability Has
          No Support Under Florida Law ............................................39

      D.  The District Court Correctly Disposed of This Matter
          On Summary Judgment. .......................................................41

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Aboy v. State Farm Mut. Auto.*,
   394 F. App'x 655 (11th Cir. Aug. 30, 2010) ...............................................25, 29

*Access Now, Inc. v. Southwest Airlines Co.*,
   385 F.3d 1324 (11th Cir. 2004) ...........................................................................37

*Aldana v. Progressive Am. Ins. Co.*,
   828 F. App'x 663 (11th Cir. Oct. 1, 2020) ..........................................................24

*Bailey v. Allgas, Inc.*,
   284 F.3d 1237 (11th Cir. 2002) ...........................................................................22

*Bannon v. GEICO Gen. Ins. Co.*,
   No. 15-22524, 2016 WL 8740227 (S.D. Fla. Nov. 7, 2016), *aff'd*,
   743 F. App'x 311 (11th Cir. July 20, 2018) ........................................................41

*Beal v. Paramount Pictures Corp.*,
   20 F.3d 454 (11th Cir. 1994) ...............................................................................23

*Berges v. Infinity Ins. Co.*,
   896 So. 2d 665 (Fla. 2004) ...........................................................25, 26, 29, 40

*Davis v. Nationwide Mut. Fire*,
   370 So. 2d 1162 (Fla. 1st DCA 1979) .................................................................24

*Deary v. Progressive Am. Ins.*,
   No. 21-11878, 2022 WL 2916358 (11th Cir. July 25, 2022) .............................42

*Dudash v. Southern-Owners Ins. Co.*,
   No. 8:16-CV-290, 2017 WL 1598974 (M.D. Fla. Apr. 28, 2017) .....................41

*Ellis v. GEICO Gen. Ins.*,
   No. 21-12159, 2022 WL 454176 (11th Cir. 2022).............................................42

*Eres v. Progressive Am. Ins. Co.*,
   998 F. 3d 1273 (11th Cir. 2021) ...................................................................41, 42

*Snowden ex rel. Est. of Snowden v. Lumbermens Mut. Cas.*,
   358 F. Supp. 2d 1125 (N.D. Fla. 2003) ...............................................................24

*Harvey v. GEICO Gen. Ins. Co.*,
    259 So. 3d 1 (Fla. 2018) ...................................................................24, 27, 28, 29

*Johnson v. GEICO*,
    318 F. App'x 847 (11th Cir. Mar. 11, 2009) .................................................30, 42

*Machalette v. Southern-Owners Ins. Co.*,
    2011 WL 3703368 (M.D. Fla. Aug. 23, 2011)....................................................25

*Maldonado v. First Liberty Ins. Corp.*,
    546 F. Supp. 2d 1347 (S.D. Fla. 2008), *aff'd*, 342 F. App'x 485
    (11th Cir. Aug. 17, 2009).....................................................................................37

*Mesa v. Clarendon Nat. Ins.*,
    799 F.3d 1353 (11th Cir. 2015) ..........................................................................42

*Pelaez v. Gov't Emps. Ins.*,
    13 F.4th 1243 (11th Cir. 2021) ...........................................................................42

*Powell v. Prudential Prop.*,
    584 So. 2d 12 (Fla. 3d DCA 1991)...........................................................*passim*

*SEC v. Monterosso*,
    756 F.3d 1326 (11th Cir. 2014) ..........................................................................22

*Shin Crest PTE, Ltd. v. AIU Ins. Co.*,
    605 F. Supp. 2d (M.D. Fla. 2009), *aff'd*, 368 F. App'x 14 (11th
    Cir. 2010) .............................................................................................................25

*Sowell v. GEICO Cas. Ins. Co.*,
    No. 3:12-cv-226, 2014 WL 11511674 (N.D. Fla. Nov. 14, 2014)....................41

*Urquilla-Diaz v. Kaplan Univ.*,
    780 F.3d 1039 (11th Cir. 2015) ..........................................................................23

*Valle v. State Farm Mut. Auto.*,
    394 F. App'x 555 (11th Cir. 2010)......................................................................42

*Welford v. Liberty Ins. Co.*,
    109 F. Supp. 3d 1085, *aff'd*, 713 F. App'x 969 (11th Cir. Nov. 29,
    2017) ........................................................................................................25, 26, 29

**Statutes**

28 U.S.C. § 1291 ....................................................................................2, 3

## **INTRODUCTION**

At issue in this appeal is bad faith under *Powell v. Prudential Prop.*, 584 So. 2d 12 (Fla. 3d DCA 1991). Kinsale Insurance Company ("Kinsale") tendered its policy limit within six days of learning that its insured had been sued. Appellants suggest that was too late.

Appellants filed a counterclaim against Kinsale for bad faith. After the conclusion of discovery, Kinsale moved for summary judgment. The district court reviewed the briefing, including Kinsale's largely undisputed statement of material facts. The district court held no reasonable jury could conclude Kinsale acted in bad faith in handling the Lodge's claim.

This Court should affirm.

1

## JURISDICTIONAL STATEMENT

Appellants' statements regarding jurisdiction are accurate. The Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.     Whether the district court correctly held based on the undisputed record evidence that no reasonable jury could conclude Kinsale acted in bad faith in handling the Lodge's claim.

## STATEMENT OF THE CASE AND FACTS

### A.  *The Drive-By Shooting*

On March 2, 2015, Tanya Oliver was a patron at the Lodge. (DE 92 at 30.) The Lodge was hosting a social event called "Grown & Sexy Night," which included live music and alcoholic beverages. (DE 91 at 244.) Oliver was with Patricia Almore and Shameka Newman. (DE 89 at 56.) At approximately 1:00 A.M., Oliver and her friends got into an altercation with a group of female patrons on the dance floor. (DE 96, 9:16-10:8; DE 99, ¶36; DE 107, ¶36.) The second group included Curtia Reed and Janiecia Briggs. (DE 96, 10:9-14.)

The Lodge's security guards responded "in a matter of seconds." (DE 92 at 34.) Security guards Antonio Andrews and Craig Ferguson intervened and separated them. (*Id.*) Andrews escorted Oliver and her group to the front entrance, while Ferguson escorted the Reed group out the back. (*Id.*) The guards removed

2

both groups from the building, waited until "everything was okay," and then came back inside to close for the night. (*Id.*)

After the security guards left, the groups confronted each other in the rear parking lot. (DE 89, 19:21-24.) A second fight ensued. After that fight ended, the Reed group left the Lodge's premises entirely, walked to a neighboring property, and got in their vehicle. (DE 89, 20:16-24.) The Oliver group walked to their vehicle, which was parked inside the Lodge's parking lot. (DE 96, 10:21-24.)

As the Oliver group was driving off, the Reed group drove back, cut in front of Oliver's vehicle, and fired multiple gunshots into Oliver's vehicle. (*Id.*, 11:5-8.) Oliver was shot in her forehead. (*Id.*, 11:9-12; DE 90 at 45.)

### B. *The Police Investigation*

The Ft. Pierce Police Department investigated the incident. (DE 90 at 41-49.) The preliminary police report identified Curtia Reed and Janiecia Briggs as suspects for aggravated assault and battery. (*Id.* at 46-47.) The report contained a half-page "narrative" regarding the incident. (*Id.* at 45.) According to the police, Oliver was sitting in the front passenger seat of a Mercury Sable vehicle with "a gunshot wound to her forehead." (*Id.*) Almore and Newman were "too emotional and frantic to give detailed information," but "managed to mention Curtia Sharee Reed … as the suspected shooter." (*Id.*) The police report identified Ferguson and Andrews as individuals "who worked security for the [Lodge]," and noted they

removed "Almore and an unknown female for fighting in the club." (*Id.*) Sometime after the security guards removed them from the Lodge, they started "arguing in the rear parking lot." (*Id.*) The police report concludes: "The females separated and continued to their vehicle." (*Id.*)

The police report did not contain any other information regarding the events leading up to the shooting. (*Id.* at 45.) The report did not identify any failures in the Lodge's security, nor assign any fault to the Lodge or its security guards for handling the unruly groups. (*Id.*)

### C. *Letter Of Representation From Reed's First Lawyer*

Eight months after the incident, on October 29, 2015, Oliver hired an attorney, Joseph Landy. (DE 90, 13:9-12.) On November 5, 2015, some nine months after the shooting, Landy's office sent a one-page Letter of Representation ("LOR") to the Lodge. (*Id.* at 81-82.) According to Landy, the LOR was a "boilerplate insurance disclosure letter" prepared in a "form system." (*Id.*, 17:13-21, 25:8-26:6.) The LOR did not articulate any theory of liability against the Lodge, much less provide facts regarding what happened. (*Id.* at 81-82.) It contained a single sentence that: "You *may* be legally responsible for the injuries Tanya Oliver sustained …" (*Id.*.) (emphasis added.) The LOR requested the Lodge provide insurance disclosures under Florida Statute § 627.4137. (*Id.*)

### D.  *The Lodge's Policies With Kinsale and Mount Vernon*

The Lodge purchased a surplus lines, Commercial General Liability policy from Kinsale for claims involving bodily injury. (DE 99, ¶¶4-5; DE 107, ¶¶4-5; DE 114.) The policy included an Assault and Battery Sublimit Endorsement, which limited coverage to $50,000 for claims involving an assault and battery. (*Id.*) The sublimit was eroded by any outside defense and investigation expenses incurred by Kinsale. (*Id.*)

The Lodge was concurrently insured under a Liquor Liability policy with Mount Vernon that also provided coverage for claims involving bodily injury. (DE 99, ¶¶6-7; DE 107, ¶¶6-7; DE 114.) The Mount Vernon policy contained an Assault and Battery Sublimit Endorsement, which limited coverage to $300,000 for claims involving an assault and battery. (*Id.*) Unlike the Kinsale policy, the Mount Vernon sublimit was not eroded by outside defense and investigation expenses. (*Id.*)

### E.  *The Lodge's First Notice to Kinsale*

On November 23, 2015, nearly a month after the LOR, the Lodge first notified Kinsale and Mount Vernon about the incident. (DE 99, ¶¶8-11; DE 107, ¶¶8-11; DE 114.) The loss notice did not attach the LOR from Landy or the police report. (*Id.*) The loss notice merely included a statement from the Lodge's insurance agent that: "I do not have much on it at this time … there was a board

5

change this past summer and [Lodge] did not seem to know much about past events. [Lodge] had mentioned this summer that a drive by shooting near the [Lodge] but that it wasn't connected to the [Lodge]. I did not hear back from [the Lodge] so I believed it was not related to the [Lodge]." (*Id.*)

### F. *Kinsale's And Mount Vernon's Investigation*

Kinsale assigned Senior Claims Examiner, Catherine Thrift, to investigate the claim. (DE 99, ¶¶12-13; DE 107, ¶¶12-13; DE 114.) On the same day Kinsale received the claim, Thrift researched media articles for information about what happened. (*Id.*) The news articles were inconsistent. (*Id.*) One article suggested Reed's group fired "handguns from inside their vehicle at the victim," a different article suggested "Oliver's friends got into an argument with Reed," while another suggested Oliver was shot while driving her car to "pick her friends up." (*Id.*)

Between November 23, 2015 and December 3, 2015, Thrift sent multiple letters to the Lodge's representative, Ralph Knight, for information. (DE 99, ¶¶13-20; DE 107, ¶¶13-20; DE 114.) On December 2, 2015, the Lodge sent the LOR and police report to Kinsale. (DE 99, ¶17; DE 107, ¶17; DE 114.)

On December 2, 2015, Thrift called Knight to discuss the incident. (DE 99, ¶18-19; DE 107, ¶18-19; DE 114.) Knight was not at the Lodge when it happened, but "workers told him two individuals started causing a problem and they were asked to leave." (*Id.*; DE 98 at 31.) Thrift asked about the Lodge's security

procedures. (DE 99, ¶19; DE 107, ¶19; DE 114.) Knight explained the Lodge had

trained security guards during the event, Ferguson and Andrews, who were

members of the Lodge. (*Id.*) For that reason, Knight suggested there was no need

to hire outside security. (DE 87, 52:1-5, 52:19-24.) According to Knight, the

security guards separated the groups as soon as they started arguing, and removed

them from the building. (DE 98 at 31.) The Reed group "left," but came back. (*Id.*)

Later that day, Thrift called the Lodge's insurance agent for information.

(DE 99, ¶¶20-21; DE 107, ¶¶20-21; DE 114.) The Lodge's agent emphasized there

was "some discrepancy on whether or not [the Lodge] was open at the time and if

this was a drive-by after closing time." (*Id.*) The agent notified Thrift that the loss

was also reported to the liquor liability insurer, Mount Vernon. (*Id.*) At that time,

Mount Vernon had retained an independent investigation firm, Mitchell Claims

Service, Inc. ("Mitchell Claims"), to perform a "comprehensive general

liability/bodily injury" investigation. (DE 99, ¶¶21, 32; DE 92, 12:11-13:1, 25:16-

20, 26:17-27:14.) Thrift informed the agent that the Kinsale policy's Assault and

Battery Sublimit was eroding. (DE 99, ¶21; DE 107, ¶21; DE 114.)

On December 3, 2015, Thrift called field adjuster, David Danowit, at

Mitchell Claims, for details of the incident. (DE 99, ¶31; DE 107, ¶31.) Danowit

confirmed Mitchell Claims was retained for a "comprehensive general liability"

investigation; the investigation was not limited to "liquor liability" only. (DE 92,

7

25:16-24; DE 99, ¶¶31-35; DE 107, ¶¶31-35.) Mitchell Claims described its investigation as follows: "General liability is when we have to determine liability, negligence. We take statements. We go out there. We talk to people involved. We take photos and we try to determine who's at fault for the accident. Is there negligence and bodily injuries? We evaluate medicals and try to determine the value of the case based on the liability and the injury." (DE 92, 12:11-13:1.) Mitchell Claims explained it was a "holistic investigation" of liability, including "premises liability," "negligent security," "negligence," and "liquor liability." (DE 92 at 13:2-13, 25:16-24; DE 99, ¶34; DE 92 at 30-37, 38-41, and 42-43.)[1]

Thrift asked Danowit if he would share the results of his "comprehensive" liability investigation with Kinsale. (DE 99, ¶31; DE 107, ¶31.) Danowit "agreed to share the results of [his] [full] investigation with [Kinsale]," which is customary and typical in the insurance industry. (DE 99, ¶31; DE 107, ¶31; DE 92, 11:18-12:10.) From that day forward, Kinsale and Mitchell Claims worked collaboratively during the entire investigation process. (DE 92, 26:17-30:22; DE 99, ¶¶31-47; DE 107, ¶¶31-47; DE 114.)

Mitchell Claims's investigation involved "talking to as many witnesses as possible," "doing scene investigations," "knocking on doors," "taking photographs," "calling police stations," "[going] out on the street trying to talk to

---

[1] Danowit died before he could be deposed in this action. (DE 92, 10:7-9.)

8

people and get information about the loss," and "trying to reach plaintiff's counsel." (DE 99, ¶42; DE 87, 61:4-17, 178:16-179:16, 184:11-186:13; DE 107, ¶42.) Thrift explained: "[E]ven though [general liability and liquor liability] are two different risks," it was "still … one investigation of one incident that occurred." (DE 99, ¶42; DE 87, 61:4-17; DE 107, ¶42.)

Kinsale worked in collaboration with Mitchell Claims during the investigation to "get a handle on the facts of this loss, coverage, and liability," and "to learn as much as we could about the loss." (DE 99, ¶42; DE 87, 68:22-69:4, 76:2-8, 82:21-83:16, 148:2-16, 200:23-201:10, 207:14-208:2; DE 107, ¶42.) Although Mitchell Claims was investigating in the field, Thrift continued her own investigation because she wanted to "uncover as many stones as we can." (DE 99, ¶43; DE 87, 104:16-106:3, 170:4-15, 196:2-5, 210:13-20; DE 107, ¶43.)

On December 3, 2015, Danowit continued to share information about his investigation with Thrift. (DE 99, ¶¶36, 39; DE 107, ¶¶36, 39.) According to witness statements, around 1:00 A.M., "two girls got into a fight on the dance floor," and each was with their own group. (*Id.*) The "DJ called security to separate them." (*Id.*) Within "a matter of seconds" two security guards arrived and separated the fighting patrons. (*Id.*) Security guard Andrews led the Oliver group toward the front door. (*Id.*) Security guard Ferguson led the Reed group toward the

back door. (*Id.*) About 10 minutes later, the shooters (Reed and Briggs) were in their car, drove by the victim's car, and fired about five shots. (*Id.*)

The Ft. Pierce Police eventually arrested all three people in the shooter's car. (DE 99, ¶36; DE 107, ¶36.) Danowit confirmed they were drinking alcohol. (*Id.*) According to Danowit, the Lodge would not offer much more information "before meeting with their members." (*Id.*) Thrift confirmed there were no surveillance videos, receipts, or witnesses. (*Id.*, ¶37.)

On December 3, 2015, Thrift sent the Lodge an eight-page Reservation of Rights letter. (DE 99, ¶30; DE 107, ¶30.) The letter advised the Lodge regarding Kinsale's investigation, and highlighted the policy's Assault and Battery Sublimit Endorsement, the eroding Supplementary Payments Endorsement, and the Liquor Liability Exclusion. (*Id.*)

That same day, Thrift mailed Landy a response to his LOR and request for insurance information. (DE 99, ¶28; DE 107, ¶28.) Even though Landy's request to Kinsale was legally defective because Kinsale was a surplus lines insurer not subject to Florida Statutes § 627.4137, Thrift responded to him within 24 hours of receiving a copy of his request. (*Id.*) Landy agreed Kinsale's response "fully complied" with his request. (*Id.*; DE 90, 38:25-39:9.)

Thrift called Landy, left him a voice-message, and requested an opportunity to discuss incident. (DE 99, ¶29; DE 99-1.)

10

Landy never returned her call. (DE 99, ¶¶52, 62; DE 107, ¶¶52, 62.)

In December 2015, Danowit conducted more interviews. (DE 99, ¶39; DE 107, ¶39.) According to security guard Ferguson, when "both groups were escorted outside, [the security guards] *made sure everything was okay* and they then proceeded to go inside the club area. It was at that time that [the security guards] decided to go ahead and start asking people to leave as [the Lodge] [was] going to close the club early." (*Id.*) (emphasis added.) Danowit interviewed Andrews who confirmed "the shooting occurred outside of the club area as [the Lodge] [was] in the process of closing the bar." (DE 92 at 34-35.)

Danowit also interviewed the Lodge's Chairman of Trustees, Bertram Taylor. (DE 92 at 32.) According to Taylor, the Lodge "did not think much about it, as it occurred outside of the club/bar area *and they were closed at the time*." (*Id.*; DE 99, ¶38; DE 107, ¶38) (emphasis added.) Danowit also interviewed the Lodge's Treasury Secretary, Ralph Knight. (*Id.*)  Knight corroborated Taylor's account and had no new information. (*Id.*)

On December 29, 2015, Danowit continued to share information with Kinsale. (DE 99, ¶44; DE 107, ¶44.) Danowit advised Thrift that "no one [was] talking" and the "loss occurred in a bad area of town." (*Id.*)

That same day, Danowit sent a letter to Landy requesting a statement from his client "regarding the facts of the accident; the nature and extent of her injuries;

the names, addresses, and telephone numbers of her treating physicians and
facilities; and the names, addresses, and telephone numbers of any witnesses."
(*Id.*, ¶48; DE 92 at 44.)

Landy never responded. (DE 99, ¶¶52, 62; DE 107, ¶¶52, 62.)

In January 2016, Thrift researched a news article regarding the incident. (DE
87 at 149; DE 107, ¶90.) Thrift was continuously "looking for any information
outside of talking to the insured and outside of Mr. Danowit's investigation … any
information I could find independent of those other sources regarding this claimant
or the loss, anything at all." (DE 87, 168:23-169:6.)

On February 12, 2016, Danowit sent a second letter to Landy requesting a
statement from his client "in order to proceed with our investigation," and to
discuss "the facts of the accident … and the nature and extent of her injuries," even
offering to take it "whether recorded or non-recorded." (DE 99, ¶48; DE 107, ¶48;
DE 92 at 45.)

Landy never responded. (DE 99, ¶¶52, 62; DE 107, ¶¶52, 62.)

Danowit called Landy on February 12, 2016, February 29, 2016, March 3,
2016, and March 9, 2016. (DE 99, ¶49; DE 107, ¶49.)

Landy never responded. (*Id.*, ¶¶52, 62.)

### G. *Liability Against the Lodge*

<u>Mitchell Claims</u>: On March 1, 2016, Danowit spoke to Thrift, explained he tried interviewing every possible witness "but no one [was] willing to talk." (DE 99, ¶¶45-46; DE 107, ¶¶45-46; DE 114.) Danowit had "no new updates," and said that the "only thing we have is a parking lot and there's nothing there." (*Id.*) Danowit did "not see any liab[ility]," and said Reed's attorney "will have to prove [liability] up, but doesn't think they have a case." (*Id.*) Danowit's supervisor, Mitch Adelman, reviewed every report from Danowit. (DE 99, ¶¶58-59; DE 107, ¶¶58-59; DE 114.) Danowit never gave Adelman any indication the Lodge was liable. (*Id.*) Adelman independently evaluated liability and also concluded there was no liability against the Lodge. (*Id.*; DE 92, 14:17-20.)

<u>Mount Vernon</u>: Peter Alfeche adjusted the loss for Mount Vernon. (DE 99, ¶60.) Alfeche never "saw any clear evidence of liability." (DE 93, 155:1-23.) Alfeche believed it was "questionable liability" at most. (*Id.*) Danowit never told Alfeche "that the Lodge was clearly liable for this incident." (DE 99, ¶60; DE 93, 155:14-18.) Even after suit was filed, Alfeche agreed liability was uncertain:

Q:    Up until this point, though, no conversation from Landy, no response from Landy, Attorney Landy, whatsoever. Correct?

A:    Correct.

Q:    Liability was reasonably unclear. Correct?

A:    Correct.

13

(DE 93, 216:7-14.) (Cleaned up.)

The Lodge: The Lodge always contested liability. (DE 99, ¶61; DE 107, ¶61; DE 114.) The Lodge's leadership initially "did not think much about it, as it occurred outside of the club/bar area and they were closed at the time." (DE 99, ¶38; DE 107, ¶38; DE 114; DE 92 at 32.) In March 2016, the Lodge even assumed "the matter was dead." (DE 92 at 38.) In April 2016, the Lodge asked Danowit "to close its file" because it had not "heard or received anything … related to this issue," and it believed the issue "was a done deal." (DE 92 at 42.) To this day, the Lodge disputes it has any fault:

> Q:    Let me ask you this: To this day, do you think you are liable for that incident? Do you think there's anything the Lodge could have done to stop that?
>
> A:    No, sir.

(DE 89, 77:23-78:1; *see also*, DE 89, 20:25-22:5.)

Kinsale: Thrift testified by March 2016, she "did not see any liability based on the facts at that time." (DE 87, 96:5-11.) Following months of investigation, "there was just never enough information available to us to show that there was clear liability on the part of the Lodge." (*Id.*, 146:2-19.). Reed's attorneys never articulated a theory of liability, never made a demand, and never presented facts of any liability let alone facts showing the Lodge was clearly liable. (DE 99, ¶¶52-53, 62; DE 107, ¶¶52-53, 62; DE 114.) Thrift explained, "as you can see from my

14

notes with Dave Danowit, we never did determine that there was any liability on the insured. We – we never had any allegations from any party telling us what – what duties our insured had and what duties they had breached and how in the world they were liable. And we also knew that this was a targeted murder by a third party. And … I don't how our insured would be responsible for a targeted crime." (DE 99, ¶¶52-53, 56, 62; DE 107, ¶¶52-53, 56, 62; DE 114.) As the investigation waned, "nobody [was] returning our phone calls," Kinsale "[did not] see any liability," and Kinsale "wonder[ed] if that's not how … the case might end." (*Id.*)

### H.  *Landy Declines Reed's Case*

Kinsale, Mount Vernon, Danowit, and Mitchell Claims did not know it, but about four weeks after Landy sent his LOR, he decided he did not want Reed's case. (DE 99, ¶¶50-52, 62; DE 107, ¶¶50-52, 62; DE 114.) Landy did not do much negligent security work, he was too busy for the "amount of work that was going to be involved," and "it was better to be handled by an expert in the area." (*Id.*)

Landy referred Reed to Michael Haggard at The Haggard Law Firm, P.A. (DE 99, ¶¶51-52; DE 107, ¶¶51-52; DE 114.) Haggard took over the case on December 11, 2015. (DE 99, ¶51; DE 107, ¶51; DE 114.)

Landy never notified Kinsale, Mount Vernon, Danowit, or Mitchell Claims that he was withdrawing as counsel. (DE 99, ¶52; DE 107, ¶52; DE 114.)

## I.  *The "Set Up" Of Kinsale*

On July 5, 2016, Oliver died from her injuries. Landy and Haggard never notified Kinsale of Oliver's death. (DE 99, ¶55; DE 107, ¶55; DE 114.)

On August 5, 2016, Haggard filed suit against the Lodge in a single count for negligent security. (DE 99, ¶63; DE 107, ¶63; DE 114.) On August 9, 2016, the Lodge was served with the complaint. (DE 99, ¶65; DE 107, ¶65; DE 114.) On August 12, 2016, Kinsale received a copy. (*Id.*)

On August 18, 2016, Mount Vernon disclaimed coverage to the Lodge for the first time. (DE 99, ¶¶66-67; DE 107, ¶¶66-67; DE 114.) On August 18, 2016, Kinsale received a copy of the Mount Vernon disclaimer letter. (*Id.*)

On August 18, 2016, six days after receiving the complaint, Kinsale tendered its un-eroded $50,000 Assault and Battery sublimit to Haggard. (DE 99, ¶68; DE 107, ¶68; DE 114.) As of August 18, 2016, Kinsale had never been contacted directly by Reed's lawyers; rather, Kinsale had only received the LOR, which was sent to the Lodge. (DE 99, ¶¶26, 52-53; DE 107, ¶¶26, 52-53; DE 114.) August 12, 2016 was the first time Kinsale understood the type of claim Reed was pursuing, whether it involved alcohol or Dram Shop liability, general negligence, intentional tort, or premises liability. (*Id.*; DE 87, 121:7-15.)

Kinsale's tender was rejected because, according to one of the partners at Haggard's firm, this was a "set up." (DE 99, ¶69; DE 87, 119:21-121:15.)

16

### J.  *The Judgment For Reed*

Kinsale appointed defense counsel to represent the Lodge. (DE 99, ¶70; DE 107, ¶70; DE 114) After three years of litigation, the case went to trial and the jury found Oliver did not lose her status as a business invitee, which would have been a complete defense. (DE 99, ¶¶1-2; DE 107, ¶¶1-2; DE 114.) The jury assessed only 70% liability on the Lodge, with the balance on Tanya Oliver herself, and also on Shameka Newman and Patricia Almore as co-aggressors. (*Id.*) Judgment was entered against the Lodge for $3,348,623.89. (*Id.*)

### K.  *The Bad Faith Claim Against Kinsale*

On February 2, 2021, Kinsale filed this action for a declaratory judgment that the policy's Assault and Battery Sublimit Endorsement applied. (DE 1.) Reed and the Lodge counterclaimed for bad faith, alleging Kinsale failed to settle Reed's claim against the Lodge when Kinsale had the opportunity to do so. (DE 45; DE 47.) The Lodge's counterclaim asserted generalized allegations, but the factual allegations centered on Kinsale's "late offer" of the sublimit. (DE 47, ¶¶16-17.) The Lodge testified its only grievance was Kinsale did not tender the sublimit sooner.  (DE 89, 94:15-95:1.) Reed's claim was Kinsale breached its duty to investigate, and also that Kinsale should have initiated settlement sooner, but without explaining when that should have been. (DE 45, ¶16.)

17

### L. *Kinsale's Motion for Summary Judgment*

Kinsale moved for summary judgment against Reed and the Lodge. (DE 99;

DE 100.) Reed never made a demand to settle within policy limits. Accordingly,

the only basis for bad faith against Kinsale was the timing of settlement

discussions under *Powell v. Prudential Prop.*, 584 So. 2d 12 (Fla. 3d DCA 1991).

Kinsale argued the narrow exception to traditional bad faith under *Powell* only

applies if: (1) liability is clear, and (2) damages are in excess of the policy.

Kinsale argued there was no evidence liability was "clear" against the Lodge. (DE

100 at 3-15.)

### M. *Kinsale's Undisputed Material Facts*

The Lodge and Reed conceded nearly all of Kinsale's statement of material

facts. (DE 107; DE 114.) The undisputed facts included:

- The Lodge waited eight months to report the incident (DE 99, ¶¶8-9), and the Loss Notice described it as occurring "near" the Lodge but that it "wasn't connected to the Lodge." (*Id.*, ¶10.)

- Kinsale received the police report on December 2, 2015. (*Id.*, ¶17), and that the Reporting Officer Narrative did not state that the shooting occurred in the Lodge's parking lot, did not identify where the complaining victim's car was parked, did not identify where the shooter's car was parked, and did not assign any fault to the Lodge. (*Id.*, ¶¶22-25.)

- Within the first 10 days of being notified of the incident, Kinsale's investigation included interviews with: (1) the Lodge's insurance agent (2) the Lodge's primary contact person, Ralph Knight, and (3) the general field investigator, Danowit. (*Id.*, ¶¶8-20.) Kinsale also attempted to call Reed's attorney. (*Id.*, ¶29.) Kinsale also reviewed the police report and news articles about the incident. (*Id.*, ¶¶12-36)

18

▪ Mitchell Claims interviewed Lodge personnel, including: (1) Bertram Taylor, (2) Ralph Knight, (3) Craig Ferguson, and (4) Antonio Andrews. (*Id.*, ¶¶31, 36-42, 44-46.) The details of Mitchell Claims's comprehensive general liability investigation were reported to Kinsale. (*Id.*) This information was part of Kinsale's investigation. (*Id.*)

▪ On December 3, 2015, Mitchell Claims reported the results of its investigation to Kinsale. (*Id.*, ¶¶31, 36-41, 44-46.)

▪ The Lodge "did not think much about [the incident]" because "it occurred outside of the club/bar area and [the Lodge] was closed at the time." (*Id.*, ¶38.)

▪ After the groups were escorted outside and through opposite entrances, "the security guards made sure everything was okay and then they proceeded to go inside the club area." (*Id.*, ¶40.)

▪ Kinsale stayed in contact with Mitchell Claims between December 2015 until suit was filed in August 2016. Mitchell Claims provided updates to Kinsale but never learned anything new that changed the liability assessment against the Lodge. Kinsale never learned of anything that changed the liability assessment against the Lodge. (*Id.*, ¶¶45-46.)

▪ Mount Vernon investigated the claim in collaboration with Kinsale. Accordingly, Mount Vernon investigated for nine months between November 2015 and August 2016. Mount Vernon disclaimed coverage on August 18, 2016. Mount Vernon never made a single settlement offer to Reed. (*Id.*, ¶¶21, 42, 60, 66.)

▪ During the investigation, Mitchell mailed two letters to Reed's attorney, Landy, and attempted to speak with Landy at least four separate times. (*Id.*, ¶¶48-49.) Landy never responded. (*Id.*, ¶¶52, 62.)

▪ In early December 2015, Landy decided not to be involved in Reed's case. (*Id.*, ¶50.) Landy declined the case because it required a "specialist." (*Id.*, ¶¶50-51.)

▪ In early December 2015, Reed retained The Haggard Law Firm. No one from The Haggard Law Firm contacted Kinsale, Mitchell, or Mount

19

Vernon. (*Id.*, ¶¶53, 64.) Reed's new counsel, Haggard, filed a lawsuit against the Lodge on August 5, 2016. (*Id.*, ¶63.)

- On August 12, 2016, Kinsale received its first notice of the lawsuit. Six days later, on August 18, 2016, Kinsale tendered its entire applicable and un-eroded sublimit of $50,000 to Reed. Reed rejected the tender. (*Id.*, ¶¶67-70.)

### N. *Reed And The Lodge's Response To Kinsale's Motion For Summary Judgment*

The Lodge argued Kinsale ignored good faith claims handling requirements, but conceded liability turned on Kinsale's "affirmative duty to initiate settlement negotiations, in situations like this, where liability is clear, and injuries so serious that a judgment in excess of the policy limits is likely." (DE 115 at 5-6.)

The Lodge argued the Oliver claim was a "ticking time bomb," even though seven years earlier, the Lodge did not report the incident because the Lodge "did not think much about it," the Lodge contested liability, and the Lodge even asked Mitchell Claims to end its investigation. (DE 115 at 16.)

Reed suggested "calling this a '*Powell* case' is somewhat misleading," despite her initial pleading that the case was about failure to timely initiate settlement negotiations. (DE 108 at 12.) Reed argued Kinsale breached duties to communicate with its insured, such as warning it of the possibility of an excess judgment, even though Reed and her various lawyers systematically refused to communicate. (*Id.*)

## O. *The District Court's Order*

The district court noted Reed's principal objection to Kinsale's statement of undisputed facts was the scope of the investigation by Danowit and Mitchell Claims. (DE 142 at 3 n.4.) The district court considered the totality of the circumstances and ruled that the "undisputed facts show that liability for the Lodge was never clear" so "no reasonable jury could conclude that Kinsale acted in bad faith in handling the Lodge's claim." (DE 142 at 9-10.)

The district court granted Kinsale's motion and entered final judgment for Kinsale. (*Id.*) Reed and the Lodge appealed.

## SUMMARY OF THE ARGUMENT

The district correctly found that "none of the parties who looked into the Lodge's liability ever suggested that the Lodge might bear more than questionable liability." (DE 142 at 9-10.) The Lodge's representatives did "not think much about" the shooting because it occurred outside the premises and while the Lodge was closing. The Lodge's insurance agent suggested the shooting "wasn't connected to the Lodge," which is also presumably why the Lodge waited nearly eight months to report the incident to Kinsale and Mount Vernon, and even asked Mitchell Claims to wrap up its investigation because no one was looking to the Lodge. The Ft. Pierce Police Department investigated the incident as a purely criminal matter and noted the Lodge's security dutifully removed the unruly

groups, which got into their vehicles. Based on its investigation, Kinsale always considered liability questionable because the Lodge did everything it could to separate the unruly groups. Danowit and Mitchell Claims did not "think they have a case." And Mount Vernon saw only "questionable liability."

Reed's own counsel did not see clear liability either. Landy never articulated a theory of liability against the Lodge, which is presumably why he would not return any calls or letters when the insurers kept reaching out to him for information. Indeed, Landy saw the situation as so complicated and unclear that he declined the case.

 And after the conclusion of dozens of depositions and a full trial, Reed and Haggard were only able to establish 70% liability on the Lodge, which is far short of the nearly 100% liability in *Powell* cases.

This was never a case of clear liability. This Court should affirm.

## <u>STANDARD OF REVIEW</u>

Kinsale agrees with Appellants that this Court reviews a district court's grant of summary judgment *de novo*.

Kinsale adds that the Court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *SEC v. Monterosso*, 756 F.3d 1326, 1333 (11th Cir. 2014). Once the moving party satisfies its initial burden, the burden shifts to the non-moving party to "come

forward with specific facts showing there is a genuine issue for the trial." *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002) (cleaned up); *see also* Fed. R. Civ. P. 56(e). "[T]he nonmoving party must offer more than a mere scintilla of evidence for its position; indeed, the nonmoving party must make a showing sufficient to permit the jury to reasonably find on its behalf." *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1050 (11th Cir. 2015). "[T]his, however, does not mean that we are constrained to accept all the nonmovant's factual characterizations and legal arguments." *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 459 (11th Cir. 1994).

## ARGUMENT AND CITATION OF AUTHORITY

### I. THE DISTRICT COURT CORRECTLY HELD NO REASONABLE JURY COULD CONCLUDE KINSALE ACTED IN BAD FAITH IN HANDLING THE LODGE'S CLAIM.

In the absence of a demand, *Powell* imposes a duty to initiate settlement negotiations only where liability is "clear." The district court rightly held based on the undisputed record evidence that no reasonable jury could conclude that Kinsale acted in bad faith.

#### A. Unlike A Case Involving Traditional Bad Faith, Kinsale Can Only Be Liable If The Lodge's Liability Was "Clear."

Traditional bad faith under a liability insurance policy under Florida law requires a demand to settle. The long-standing rule has been an insurer cannot commit bad faith if the claimant never provided the insurer with a demand to settle

23

within policy limits. *Davis v. Nationwide Mut. Fire*, 370 So. 2d 1162, 1163 (Fla. 1st DCA 1979); *Snowden ex rel. Est. of Snowden v. Lumbermens Mut. Cas.*, 358 F. Supp. 2d 1125, 1127 (N.D. Fla. 2003) (collecting cases).

Florida law carved out a narrow, limited exception to the rule. *Powell v. Prudential Prop.*, 584 So. 2d 12 (Fla. 3d DCA 1991). Under *Powell*, an insurer can be in bad faith for not affirmatively contacting the plaintiff and offering to settle—even if there was never a demand to settle. Because *Powell* imposes a remarkable burden on insurers, there are important guardrails in place. The doctrine only applies "[w]here liability is <u>clear</u>, and injuries so serious that a judgment in excess of the policy limits is <u>likely</u> …." *Id.* at 14 (emphasis added).[2]

In its brief, the Lodge distinguishes between cases where there has been a demand to settle from cases where there was no demand to settle. (*Lodge Br.*, Pg. 24.) The Lodge correctly points out that a demand to settle case "triggers a cascade" of duties that are not present in a no demand case, including everything from the duty to advise the insured of settlement opportunities to warning of the possibility of a judgment in excess of the policy limits. (*Id.* at 24 n.6.)

The Lodge and Reed nonetheless downplay their burden of having to prove

---

[2] The *Powell* "affirmative duty" was adopted by the Florida Supreme Court in *Harvey v. GEICO Gen. Ins. Co.*, 259 So. 3d 1, 6 (Fla. 2018). This Court recently clarified the duty as an "aspect" distinct from the "general rules." *Aldana v. Progressive Am. Ins. Co.*, 828 F. App'x 663 (11th Cir. Oct. 1, 2020).

"clear" liability because this was a no demand case. This was not lost on the district court either: "Reed and the Lodge do not meaningfully address Kinsale's reliance on *Powell*'s statement regarding clear liability." (DE 142 at 9.)

This is important because courts regularly grant summary judgment for insurers where the evidence falls short of establishing "clear" liability under *Powell*. *See, e.g., Welford v. Liberty Ins. Co.*, 109 F. Supp. 3d 1085, *aff'd*, 713 F. App'x 969 (11th Cir. Nov. 29, 2017) (summary judgment under *Powell* because liability was not "clear"); *Shin Crest PTE, Ltd. v. AIU Ins. Co.*, 605 F. Supp. 2d 1234, 1241 (M.D. Fla. 2009), *aff'd*, 368 F. App'x 14 (11th Cir. Mar. 26, 2010) (summary judgment for insurer where liability was not "clear"); *see also Aboy v. State Farm Mut. Auto.*, 394 F. App'x 655 (11th Cir. Aug. 30, 2010) (summary judgment for insurer under the second *Powell* prong—because the information did not establish "injuries so serious that a judgment in excess of the policy limit was likely"); *Machalette v. Southern-Owners Ins. Co.*, 2011 WL 3703368, at *5 (M.D. Fla. Aug. 23, 2011) (summary judgment for insurer under the second *Powell* prong because injuries were not so severe rendering excess judgment "likely").

Two cases provide guidance on what "clear" liability means under Florida law. *Berges v. Infinity Ins. Co.*, 896 So. 2d 665 (Fla. 2004); *Welford v. Liberty Ins. Co.*, 109 F. Supp. 3d 1085 (N.D. Fla. 2016).

In *Berges v. Infinity Ins. Co.*, 896 So. 2d 665, 681 (Fla. 2004), the Florida

25

Supreme Court equated "clear liability" with "one hundred percent fault." The insured was involved in a fatal car accident. Within days of the accident, the insurer's investigation revealed "this was a case of clear, if not aggravated, liability." *Id.* at 681. The insurer found out during its investigation that the driver was intoxicated when he crossed the center line and collided head-on with the claimant's vehicle. The insurer itself eventually assigned "one hundred percent fault" to its insured, which the Florida Supreme Court understood to mean "a case of clear liability," exactly like the adjuster's own internal notation in *Powell*. *Id.* at 681.

In *Welford v. Liberty Ins. Co.*, 109 F. Supp. 3d 1085 (N.D. Fla. 2016), the district court conducted a detailed analysis of *Powell* and the "clear liability" requirement. The court observed that "[o]n its face, *Powell* does not obligate insurers to initiate settlement negotiations whenever an insured is involved in a crash and has some potential liability." *Id.* The court sensibly explained that "if that were the law, insurers would have that obligation in virtually every accident case as it is almost always possible that an insured may be found partially liable for an injury." *Id.* at 1096. Instead, the court reasoned, "*Powell* speaks specifically about an insurer's responsibility when its insured's liability is clear." *Id.* The court sensibly understood: "clear" to mean: "'free from doubt; sure. Unambiguous.'" *Id.* (citing *Black's Law Dictionary* (10th ed. 2014)). If that was not enough, the district

court elaborated with more straightforward definitions: "obvious; beyond reasonable doubt; … plain; evident; free from doubt or conjecture, unequivocal." *Id.* (citations omitted).

The Lodge's liability was not clear. At issue was a drive-by shooting by a group of patrons who were escorted off the premises by security and decided to come back and fire into Oliver's vehicle as she too was leaving.

In its brief, the Lodge suggests the district court failed to consider the "totality of the circumstances" to determine whether Kinsale had an "affirmative duty to offer to settle." (*Lodge Br.* at 22.) This argument is belied by the literal words of the order. The district court described the foundational principles of bad faith law, including that "Florida law 'evaluates the question of whether an insurer has acted in bad faith in handling claims against the insured' under a 'totality of the circumstances' standard." (DE 142 at 7.)

Judge Moore accurately described and understood Florida law; he just disagreed with Reed and the Lodge that a reasonable jury could conclude Kinsale acted in bad faith.

In their briefs, Appellants discuss *Harvey v. GEICO Gen. Ins. Co.*, 259 So. 3d 1 (Fla. 2018), but avoid describing the facts. In *Harvey*, GEICO's adjuster determined from the beginning that it was "a case of clear liability" and that a verdict could exceed the policy limit. *Id.* at 8. Whether the *Powell* requirements

27

applied or not was never disputed.[3] And while the claimant did not demand money from GEICO, he did make a demand in furtherance of settlement—he demanded a recorded statement to determine the extent of the insured's assets, whether the insured had additional insurance, and if the insured was in the course and scope of his employment at the time of the accident. *Id.* at 4. GEICO's handling of that demand was the focus of the entire bad faith trial. ("When Domnick, the estate's attorney, requested a statement from Harvey, [GEICO] refused the request, despite acknowledging that such statements were standard practice. Additionally, not only did [GEICO] refuse the request, but she did not inform Harvey of the request until two weeks later, when [GEICO] received a letter from Domnick stating that the request had been denied.") *Id.* at 9 (Fla. 2018). Appellants are wrong to describe *Harvey* as a "no-demand case." (*Lodge Br.* at 25.) Moreover, an important part of *Harvey* was plaintiff's counsel was in regular contact with GEICO's adjuster, including telephone calls and letters, describing what they needed and why it would help posture the case for settlement. *Id.* at 4.

The record here is totally different. The Lodge's liability was never clear. As the district court found, "none of the parties who looked into the Lodge's liability ever suggested that the Lodge might bear more than questionable

---

[3] *Harvey* is 42-pages long, but *Powell* is mentioned just once in the majority and once in the dissent. 259 So. 3d at 7, 19.

liability." (DE 142 at 9-10.) And unlike *Harvey* there was never a demand from Landy to Kinsale for anything except insurance policy disclosures, which Thrift dutifully provided within only 24 hours. And unlike the lawyer in *Harvey*, none of Reed's lawyers would return phone calls or bother communicating. Danowit tried contacting Landy at least six times. Thrift called him too and he never called her back. And after Landy determined the case was too complex for him to handle he never let anyone know. Appellants gloss over these undisputed facts, which are very different from the narratives in *Harvey* and *Powell*. In *Powell,* for example, counsel for the claimant sent the insurer three letters pleading with the insurer to let him know about the policy limits because his client was in a dire financial position and wanted to settle. *Powell v. Prudential Prop. & Cas. Ins. Co.*, 584 So. 2d 12, 13 (Fla. 3d DCA 1991). Communication matters. No reasonable jury could conclude Kinsale acted in bad faith.

**B.  The Undisputed Record Evidence Supports Affirmance Of The District Court's Order.**

In a bad faith case, the evidence must be viewed in the context of the circumstances of each particular case. *See Berges*, 896 So. 2d at 680 (stating that each bad faith case "is determined on its own facts"). Absent clear liability, or damages so serious that a judgment in excess of the policy limits is likely, an insurer has no affirmative duty to initiate settlement negotiations. *Welford*, 190 F. Supp. 3d at 1095-97; *Aboy*, 394 F. App'x at 656-57. Furthermore, the *Powell* rule

does not strip an insurer of its duty and right to fully investigate claims. *See Johnson v. GEICO*, 318 F. App'x 847, 851 (11th Cir. Mar. 11, 2009) ("no obligation exists to accept a settlement offer (or to tender policy limits in advance of a settlement offer) without time for investigation").

The undisputed material facts show a prompt and robust investigation that was fully compliant with Florida law.

The Lodge knew about the incident on the day it happened but waited eight months to notify its insurers. (DE 99, ¶¶8-9.) The Lodge's leadership "did not think much about it, as it occurred outside of the club/bar area and they were closed at the time." (DE 92 at 32.)

Kinsale received notice on November 23, 2015. (DE 99, ¶9.) Kinsale immediately started investigating. (*Id.*, ¶¶12-13.) Thrift found news articles with conflicting accounts of the incident. (*Id.*) The loss notice included a notation from the Lodge's agent that it was a "drive by shooting," which happened "near" the Lodge but "wasn't connected to the Lodge." (*Id.*, ¶10.) Complete defenses to liability quickly emerged.

Over the next 10 days, Kinsale made exceptional efforts to communicate with the Lodge and gather information. (DE 99, ¶¶11-22.) Thrift called and emailed the Lodge multiple times. (*Id.*) The Lodge eventually provided the LOR and police report to her. (*Id.*) The documents did not substantiate liability. The

police report, for instance, contained a half-page factual narrative that two women were removed for fighting and that they left and continued to their vehicles. (DE 90 at 45.)

The police report did not indicate negligent conduct or inadequate security, but to the contrary revealed the opposite: a fight between patrons occurred at the Lodge, security guards separated the patrons and removed them from the Lodge, and the patrons went to their vehicles to leave. (*Id.*) Despite Appellants' assertions, the scant details in the police report do not support any liability against the Lodge, much less clear liability.

The LOR provided even less information. The 1-page "boilerplate" letter did not describe the incident, did not articulate a theory of liability, and did not identify damages. (DE 99, ¶¶26-27; DE 90 at 81.) It did not explain where the incident occurred, whether it happened on the Lodge's property, or how the Lodge was involved. (*Id.*)

Thrift collaborated with Danowit at Mitchell Claims, who was performing a "comprehensive general liability/bodily injury" investigation. (DE 99, ¶¶31, 36-41, 44-46.) It made sense for her to work with Mount Vernon because her policy was eroding while Mount Vernon's was not. (DE 99, ¶¶35, 42-43; DE 87, 61:4-17, 81:22-82:8, 83:7-10, 178:16-179:16, 184:11-186:13.)

Danowit "agreed to share the results of [his] [full] investigation with

[Kinsale]." (DE 99, ¶31.) Danowit interviewed Knight, Taylor, Ferguson, and Andrews. (DE 99, ¶¶36-41.) He interviewed the bartender at the Lodge, Brenda Henderson. (DE 92 at 38.) Danowit and Thrift knew two women got into a fight on the dancefloor, the Lodge's security guards immediately intervened and separated them, one security guard escorted one group to the back door area, and one security escorted the second group to the front door area. (DE 99, ¶¶36, 39.) There was no surveillance video and no witnesses. (*Id.*, ¶37.) There was no one left to interview because no one was willing to talk. Kinsale stayed in regular contact with Mitchell Claims between December 2015 until suit was filed in August 2016. (DE 99, ¶¶44-46; DE 92, 29:10-30:22; DE 92 at 55; DE 87, 103:1-7.)

During the investigation, Mitchell Claims sent letters to Landy and kept trying to call him. (DE 99, ¶¶48-49.) Landy never responded. (*Id.*, ¶¶52, 62.) Meanwhile, in early December 2015—and unbeknownst to Kinsale, Mitchell Claims, Danowit, or Mount Vernon—Landy decided he did not want Reed's case. (*Id.*, ¶50.) It was too complicated for him. (*Id.*, ¶¶50-51.)

In early December 2015, Reed hired Haggard. (DE 99, ¶51.) No one from Haggard's office ever contacted Kinsale, Mitchell Claims, Danowit, or Mount Vernon. (*Id.*, ¶¶53, 64.) It was reasonable for everyone involved to assume there was no reason for Reed to pursue the Lodge.

After Haggard eventually filed suit on August 5, 2016, six days later,

Kinsale tendered its entire applicable and un-eroded sublimit of $50,000 to Reed. (*Id.*, ¶68.) Reed rejected the tender. (*Id.*, ¶¶67-70.)

The Lodge's citation to the claim note on November 23, 2015 is factually inaccurate. (*Lodge Br.* at 33.) Thrift explained her reference to the parking lot—which she made literally 10 minutes after she was assigned to investigate, was simply in connection with a "coverage" limitation for a designated project or premises. (DE 87, 46:2-8.) Thrift testified that as her investigation unfolded, "we had conflicting stories that [the incident] had happened in the parking lot, it had happened behind the parking lot, or adjacent to the parking lot. And, it had happened after our insured had removed these parties from the building." (DE 87, 146:2-19; *see also*, 96:5-11, 105:18-106:3, 118:22-119:15.) There was no video footage. Thrift's testimony was consistent with statements from the Lodge's personnel, security guards, and retail agent, none of whom could even confirm where the shooting happened.

The Lodge's summation of the "basic facts of the incident" did not matter. (*Lodge Br.* at 33-34.) Simply because a fight occurred at the Lodge, and the Lodge's security guards separated the patrons and removed them from the building, does not establish clear liability. The Lodge ignores evidence uncovered during Kinsale's investigation that (1) the shooting did not happen on the Lodge's property, (2) the shooting occurred after the Lodge was closed, (3) the shooting

occurred after the patrons had been ejected from the Lodge (which made them trespassers), and (4) the shooter even left the Lodge's premises completely and then returned to the Lodge and shot the victim before she could leave the Lodge (which was a break in the chain of causation). The Lodge also ignores the fact that the shooting happened while the victim herself was attempting to leave, and the shooting happened after the patrons were drinking alcohol, additional factors which underscored the complete absence of any liability against the Lodge.

The Lodge's characterization of Danowit's investigation is erroneous. (*Lodge Br.* at 34.) Danowit obtained a statement from security guard Ferguson, who confirmed that "when both groups were escorted outside, [the security guards] made sure everything was okay and [the security guards] then proceeded to go inside the club area," and decided to close early. (DE 92 at 34; DE 99, ¶40.) Nothing from that statement suggested the Lodge's security "failed to stay outside until the women left the premises." It says the opposite: security remained outside until "everything was safe," and then went back to close the Lodge. If anything, Ferguson's statement confirmed a completely reasonable and appropriate security response. Kinsale did not possess any facts or information during the investigation that contradicted Ferguson, who "made a good witness … [and] answered all of our questions in a straightforward, clear, and concise manner." (DE 92 at 34.)

The Lodge's attempt to rely on Landy is misguided. (*Lodge Br.* at 35.)

34

Landy was so inexperienced he could not handle Reed's case because of the "amount of work that was going to be involved," that he believed it was "better to be handled by an expert in the area [of negligent security]," that he thought it "would be best to put it in the hands of a firm that … did exclusively negligent security work," and that he thought the case needed a "specialist" in negligent security. (DE 90, 17:13-21, 33:25-34:18, 41:21-42:5, 50:10-13; DE 99, ¶¶50-51.) Landy's testimony confirms liability was unclear, even for a lawyer with a financial incentive not to give away successful cases.

The Lodge fails to raise an issue of fact by citing to Christopher Marlowe's testimony. (*Lodge Br.* at 35.) Marlowe's entire opinion of liability was limited to the sparse facts contained in the half-page "narrative" in the police report. (DE 88, 64:3-9.) As the district court correctly noted, "[t]he police report does not explicitly state where the shooting occurred or assign any fault to the Lodge." (DE 142 at 3.) No reasonable person could ascribe clear liability to the Lodge based on the police report, which did not identify the location of the shooting, let alone describe negligent conduct on behalf of the Lodge, its security guards, or anyone affiliated with the Lodge. If that were the standard for clear liability in Florida, then any shooting at any business would mean the insurer would be in bad faith for not simply tendering its limit.

The Lodge's reference to Haggard's testimony is out of context. (*Lodge Br.*

at 35.) Haggard agreed the case consisted of "a complicated wrongful death case involving multiple liability experts, over 25 depositions, 20 trial witnesses and multiple complex legal issues." (DE 91, 116:16-118:12; DE 91 at 225.) Haggard's testimony was based on speculative facts that did not exist during the investigation, which is the only time frame that matters in a *Powell* case.

Kinsale never had any information during the investigation that the patrons were put "outside in the parking lot to go to round two of the fight," or that they were put outside and "there was no security out there," or that there was a "scenario from the police officers that describes an absolute violation of … industry standards." (DE 107, ¶96.) The investigation showed a scenario where the Lodge's security guards separated two groups of fighting patrons, removed one group from the front entrance, and removed a second group from the back entrance. Security "made sure everything was okay" before ever re-entering the Lodge to close the business. The only information Kinsale ever possessed during the actual, real-time investigation, was of a fight that was broken up, totally diffused, and then turned lethal when Reed left, and came back. If Reed's counsel possessed different facts, Reed's counsel could have spoken up and provided that information to Thrift, Danowit, Mitchell Claims, or Mount Vernon. He could not be bothered to return any phone calls or letters.

The Lodge erroneously says it "introduced the opinion testimony of [Reed]'s

36

insurance industry expert, Jack," but this argument was not made in the summary judgment briefing. (*Lodge Br.* at 35.) It is too late now. *Access Now, Inc. v. Southwest Airlines Co.*, 385 F.3d 1324, 1331 (11th Cir. 2004).

Even if the Lodge had relied on Jack's testimony, it would not change the outcome in the case. Jack's opinion of liability was either based on: (1) the bare factual recitation in the police report, which did not support a claim of liability against the Lodge, or (2) information obtained in the state court lawsuit against the Lodge, which was not available or known to Kinsale during its investigation. (DE 106, 18:11-20, 28:1-30:4.)

Finally, the Lodge points to a report prepared by the Lodge's defense counsel in January 2017. (*Lodge. Br.* at 36.) The statements in that report are irrelevant because they occurred more than five months after Kinsale's tender in August 2016. The Lodge is perpetrating a hindsight bias. The inquiry is limited to what the insurer knew or could reasonably ascertain—at the time. No insurer should be punished for not having a crystal ball. *See Maldonado v. First Liberty Ins. Corp.*, 546 F. Supp. 2d 1347, 1357 (S.D. Fla. 2008), *aff'd*, 342 F. App'x 485 (11th Cir. Aug. 17, 2009) (Jordan, J.) (refusing to impose "such specific additional duties" on an insurer not otherwise required under Florida law).

The Lodge fails to appreciate that liability fluctuated throughout the litigation. For instance, after discovery, the same defense counsel believed there

was a "viable basis for summary judgment" in April 2018. (DE 125-1 at 7.) The
fluctuating assessment of liability, at best, established it was always a case of
unclear liability.

The district correctly noted "none of the parties who looked into the Lodge's
liability ever suggested that the Lodge might bear more than questionable
liability." (DE 142 at 9-10.) To this day, the Lodge remains adamant it was not
liable for the unforeseeable criminal attack against Oliver. (DE 89, 20:25-22:5,
77:23-78:1.) According to Thrift, throughout her entire investigation, "there were
many unknowns … [a]nd there was just never enough information available to
[Kinsale] to show that there was clear liability on the part of the Lodge." (DE 87,
146:2-19.) Thrift explained: "We never had any allegations from any party telling
us what – what duties our insured had and what duties they had breached and how
in the world they were liable. And we also knew that this was a targeted murder by
a third party. And … I don't know how our insured would be responsible for a
targeted crime." (*Id.*, 118:22-119:15.)

According to Alfeche, he never saw any "clear evidence of liability" against
the Lodge. (DE 93, 155:1-23.) His opinion was affirmed by Mitchell Claims,
explaining that Mitchell Claims never produced information "that the Lodge was
clearly liable for this incident." (DE 99, ¶60; DE 93, 155:14-18.)

Danowit, a licensed independent adjuster with 35 years of experience, never

38

"indicated … that there was any liability against [the Lodge] in connection with the [Oliver] claim." (DE 92, 14:4-15.)

Mitch Adelman, who was Danowit's supervisor, reviewed every report from Danowit. (DE 99, ¶58.) Adelman personally evaluated liability based on the investigation and he, too, concluded there was never a basis for negligence liability against the Lodge. (DE 99, ¶59; DE 92, 14:17-20.)

Even the state attorney who prosecuted the criminal case against Reed and Briggs, Bernard Romero, said the Lodge's security guards made an "'intelligent' decision" separating the two groups, escorting them through separate entrances, and leading them to their vehicles to leave for the night. (DE 89 at 56.)

Reed's own counsel never believed there was clear liability against the Lodge. In the only communication to the Lodge during the entire investigation, the most Reed's counsel could conclude was that the Lodge "may be" liable for the incident. (DE 99, ¶27; DE 90 at 81.) This was not a case of clear liability for anyone.

### C. Appellants' Proposed Interpretation of "Clear" Liability Has No Support Under Florida Law.

The Lodge argues the district court applied *Powell* "too rigidly" and should have interpreted "clear" liability based on some sort of "confidence interval." (*Lodge Br.* at 39.)

Florida law provides ample guidance on what "clear liability" means. In *Powell*, the first court to recognize an affirmative duty to tender, the insurer "evaluated Powell's liability as 80-100%." *Powell v. Prudential Prop. & Cas. Ins.*, 584 So. 2d 12, 13 (Fla. 3d DCA 1991). It was only because liability was clear that the court imposed an affirmative duty to initiate settlement negotiations. In *Berges v. Infinity Ins. Co.*, 896 So. 2d 665, 669 (Fla. 2004), the insured was "100% at fault." The majority described the facts as one of "clearly outrageous liability," that "[t]here was never any contention that the insured was not liable for [the claimant's] injuries and damages," the insurer "concluded that the [insured] ... was 100% at fault," and "[the insurer] knew … that this was a case of clear liability and substantial damages"). *Id.* at 681.

In summary judgment briefing below, Appellants argued numerous cases to support their contention that "clear" liability under *Powell* meant something far less than "80-100%" at fault. (DE 108 at 13-14; DE 115 at 10-15.) Kinsale distinguished those cases by explaining that in each case there was some evidence the insured was either "100% at fault," or an admission by the insurer that the insured was "completely at fault," or the "sole cause of the accident." (DE 124 at 9.) For a *Powell* bad faith inference to go to the jury, there must be evidence that liability was "clear" against the insured. In every case that decided the issue, short of providing a bright line rule, "clear" liability means some percentage of fault

close to 100%.

For instance, in *Bannon v. GEICO Gen. Ins. Co.*, No. 15-22524, 2016 WL 8740227 (S.D. Fla. Nov. 7, 2016), *aff'd*, 743 F. App'x 311 (11th Cir. July 20, 2018), the insurer concluded the insured was "100% liable for the accident," and damages greatly exceeded policy limits. In *Sowell v. GEICO Cas. Ins. Co.*, No. 3:12-cv-226, 2014 WL 11511674 (N.D. Fla. Nov. 14, 2014), the court emphasized that the insurer "concluded … [the insured] was 100% at fault." In *Dudash v. Southern-Owners Ins. Co.,* No. 8:16-CV-290, 2017 WL 1598974 (M.D. Fla. Apr. 28, 2017), the carrier "noted that [the insured] was 100% liable."

### D.  The District Court Correctly Disposed Of This Matter On Summary Judgment.

Appellants variously argue the district court failed to consider "*all* of the evidence presented, from *both* sides." (*Lodge Br.* at 18, emphasis in the original.) Later they criticize the order for not being more verbose and that the district court gave "extremely short shrift to the evidence [appellants] marshalled." (*Id.* at 30.) Implicit in Appellants' argument is a district court can never grant summary judgment to an insurer in a bad faith case. But that is not the law, nor should it be.

The Florida Supreme Court has recognized "Florida courts regularly uphold summary judgments when the undisputed facts demonstrate that the insurer could not have acted in bad faith." *Berges v. Infinity Ins. Co.*, 896 So. 2d 665, 687 (Fla. 2004). This Court, too, has affirmed summary judgment where no reasonable jury

could conclude that the insurer acted in bad faith. *See, e.g., Eres v. Progressive Am. Ins. Co.*, 998 F. 3d 1273, 1281 (11th Cir. 2021) (summary judgment for insurer because "Eres has raised no possible inference of bad faith"); *Ellis v. GEICO Gen. Ins.*, No. 21-12159, 2022 WL 454176, at \*4 (11th Cir. 2022) (summary judgment for insurer because no reasonable jury could "say GEICO was not acting diligently and with the same haste and precision as if they were in the insured's shoes"); *Deary v. Progressive Am. Ins.*, No. 21-11878, 2022 WL 2916358, at \*3 (11th Cir. July 25, 2022) (summary judgment for insurer because the "delay in tendering the policy limits until June 2018 is not evidence of bad faith"); *Pelaez v. Gov't Emps. Ins.*, 13 F. 4th 1243, 1254 (11th Cir. 2021) (summary judgment because the undisputed facts "show how the failure to settle the lawsuit against the insureds did not result from bad faith of the insurer"); *Mesa v. Clarendon Nat. Ins.*, 799 F.3d 1353, 1358 (11th Cir. 2015) (summary judgment for insurer); *Valle v. State Farm Mut. Auto*, 394 F. App'x 555, 557 (11th Cir. 2010) (summary judgment for insurer where the claimant never made a demand and there were no facts that "indicated in any way a unique urgency in the resolution of [the] claim"); *Johnson v. Geico Gen.*, 318 F. App'x 847, 851 (11th Cir. Mar. 11, 2009) (summary judgment for insurer because, in part, "the record shows that liability was contested initially by Johnson"). The district court correctly considered the undisputed record evidence and concluded no reasonable jury could conclude

42

Kinsale acted in bad faith in handling the Lodge's claim.

## CERTIFICATE OF COMPLIANCE

### Fed. R. App. P. 32(g)(1)

Appellee certifies this brief complies with the type-volume limitation of Fed.

R. App. P. 32(a)(7)(B) because it contains 9,944 words, excluding the exempt

parts. Further, this brief complies with the typeface requirements of Fed. R. App.

P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6).

## CERTIFICATE OF SERVICE

I CERTIFY that on January 31, 2023, this document was filed via the CM/ECF

system. I further certify I am unaware of any non-CM/ECF participants.

/s/AARON WARREN
**AARON WARREN**